14815

STATE v. WOODS *ET AL.*

(1 S. E. (2d), 190)

282

*Messrs. D. M. Winter, J. J. Gee, U. L. Rast, Kenneth R. Kreps, James D. Walters, James A. Hutto* and *Harold C. Seigler,* for appellants,

*Messrs. A. F. Spigner, Solicitor,* and *C. T. Graydon,* for respondent,

February 4, 1939.

The opinion of the Court was delivered by MR. JUSTICE, FISHBURNE.

In the opinion prepared in this case by Mr. Justice Baker, he reaches the conclusion that the judgment below should be affirmed as to the appellant, William B. Woods, but, for the reasons stated by him, he holds that a new trial should be ordered for the other five appellants. With reference to the appellants other than Woods, he sustains certain exceptions which charge error to the trial Judge in his instructions to the jury.

We concur in the decision of all of the questions discussed and passed upon by Mr. Justice Baker except his disposition of the two questions which challenge the correctness of the charge. In his opinion, these questions present reversible error. We are constrained to reach a different conclusion on these two issues. In our opinion, the judgment of the lower Court must be affirmed as to all of the appellants. A summarized statement of the material facts will be found in Justice Baker's opinion. We proceed to consider the points at issue.

The trial Judge was requested to give this instruction on behalf of the appellants: "That if you find from the evidence that the death of Captain Sanders was a fresh and independent product of the mind of one of the confederates, outside of, and foreign to, the common design, and growing out of his individual malice, then the responsibility for that act is the one who committed it, and those who are not guilty of such act and did not consent thereto, will not be guilty of that act."

The Judge refused to give his instruction as written but, in response thereto, charged as follows:

"I refuse to charge you that proposition the way it is written, because I have already charged you practically the contrary. The design may not have been to kill at all, but if there was an unlawful scheme entered into, then what one did in furtherance of that, all did, and it wasn't necessary, Mr. Foreman and gentlemen, that the original design or

scheme should have been to take human life, but if that became necessary and human life was taken while they were carrying out the design or scheme, then the act of one would be the act of all, the hand of one would be the hand of all.

" 'Whether or not the act was in furtherance of the common design'—I have numbered that Number 2—'or whether it was the natural and probable consequences flowing from the execution of the common design, is a question of fact to be decided by the jury.' "

It may be conceded as a general proposition of law that while the parties are responsible for all incidental and consequent acts growing out of the general design, they are not responsible for independent acts growing out of the particular malice of any one of the conspirators. But, the language of the charge actually given by the Judge substantially covered the principle of law embodied in the request. He specifically charged that it was for the jury to determine whether or not the act (of Woods) was in furtherance of the common design or whether it was the natural and probable consequence flowing from the execution of the common design. By this instruction, the jury was plainly told that if the life of Captain Sanders was taken while the appellants were carrying out their plan or scheme for escape, then the act of one would be the act of all, but that it was for the jury to say whether or not such act was the natural and probable consequence flowing from the execution of the common design. This, by every reasonable intendment, excluded the appellants other than Woods, if his act in inflicting the last fatal stab upon the body of Captain Sanders was not the natural and probable consequence flowing from their prearranged plan to effect their escape.

But, aside from this, it may be regarded as extremely doubtful if the requested instruction was at all applicable to the facts of this case. Each of the appellants testified in his own behalf and they, without dissent, stated that they felt no personal ill will or malice toward Captain Sanders but only intended to use him as a hostage and as a means

of gaining their freedom. And, the other evidence in the case disclosed no individual malice.

During the three hours in which the appellants held ██ Captain Sanders captive and bound, they frequently communicated with State and prison officials through a window, and, in the presence of all of them, their spokesman and leader, the appellant, Woods, told the officers that if their demand to leave the penitentiary unmolested should be refused, they would kill Captain Sanders. They refused every offer short of freedom, freedom in accordance with the terms demanded by them, and they never surrendered until tear gas bombs, which they believed contained a deadly gas, were shot into the room they occupied. It was then, according to the appellants, that Captain Sanders received the last stab by Woods which resulted almost immediately in his death. When the officers entered this room they found Captain Sanders on the floor, dying, and with his hands still bound. It was clearly for the jury to say, as charged by the Judge, whether such act was the natural and probable consequence flowing from the common design.

A fair, honest, and intelligent jury, it seems to us, could have reached no other conclusion than that the threat of the appellants to kill, which had been previously communicated to the officers, if they were not given freedom, had been carried into execution.

Undoubtedly, when the trial Judge stated in the quoted instruction, "I refuse to charge you that proposition the way it is written, because I have already charged you practically the contrary", he had reference to the law applicable to withdrawal from the conspiracy. In a full and comprehensive charge on this phase of the case, he instructed the jury: "One who has joined in a common design to kill, or to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, escapes responsibility for a homicide committed by a confederate in pursuance of the common design,

if, before the homicide is committed, he withdraws entirely from the undertaking, and the fact of his withdrawal is communicated to his associates, under such circumstances as would permit them to take the same action. Notwithstanding his withdrawal, he is responsible for a homicide committed in pursuance of the original design, or as a natural or probable consequence of the execution thereof, by one of his associates to whom, prior to the commission of the crime, the fact of his withdrawal had not been communicated, or if it had, was not communicated under such circumstances as would permit his associate to withdraw."

The foregoing instruction had immediately preceded the requested instruction which we have herein set out, and the instruction which was given by the Judge was immediately followed by this charge: "Mere cognizance or passive acquiescence is not sufficient to make one a party to the conspiracy."

The only other question which we need to consider is whether or not the trial Judge erred in reading to the jury the penalty for kidnaping when the indictment contained no charge of kidnaping.

The appellants requested the judge to give the following instruction "Overpowering or restraining one in custody of persons who have no liberty as inmates of a prison, by those restrained, is not kidnaping within the purview and intent of the statute making kidnaping a felony."

In response to this request, the Judge charged: "Gentlemen, I refuse that in the form in which it is written. I have given you the law in reference thereto, and have told you what is necessary in order to bring a person within the Act. In other words, if you believe from the evidence that the plan, if there was one, was to seize and hold Captain Sanders in order to enable them to escape, and to hold him as a hostage until such escape was effected, then I charge you that such an act would be a felony and constitute kidnaping."

We have concurred in and adopted as heretofore stated that portion of Justice Baker's opinion in which he held that the lower Court committed no error in reading the statute bearing upon kidnaping.

The contention is made as a ground for reversal that by reading the penalty providing for kidnaping, which is identical with the penalty for murder, the jury was misled and confused and that such charge was prejudicial to the appellants.

After reading to the jury the statute enacted in 1937, Act March 22, 1937, 40 St. at Large, p. 137, defining the crime of kidnaping, and after reading the penalty therefor as a part of the general act, the Judge immediately charged the jury:

"Now, then, Mr. Foreman and gentlemen of the jury, the law is that if two or more persons form an agreement to commit a felony, any act which they do in pursuance of that scheme, the hand of one is the hand of both, and if they commit homicide while carrying out the commission of that felony, then the law says it is murder.

"I charge you, in connection with that, that the law is that, even though the act which they conspired to commit is not a felony, if it is an unlawful act and they go forward, and while engaged in that scheme of carrying out that unlawful act, one is killed, it is either murder or manslaughter, depending upon the view which the jury may take of the evidence, taking into consideration the definitions which I have given you of murder and manslaughter."

While technically the reading of the penalty might be deemed an error, we are unable to agree that under the facts and circumstances of this case it constituted reversible or prejudicial error. Throughout an able and lengthy charge covering fifteen pages of the record, the trial Judge dealt with the question of homicide and not of kidnaping. He charged the law of murder, manslaughter, conspiracy, withdrawal, aiding and abetting, and insanity, together with their various degrees and applicable qualifi-

cations. After the general charge, he at length carefully and fully charged the law with reference to reasonable doubt, presumption of innocence, and the right of the jury, if they chose to exercise it, to recommend one or more or all of the appellants to the mercy of the Court. And he explained that such recommendation, if made in the case of murder, would reduce the penalty to life imprisonment.

The appellants were charged with murder and the case was tried upon this theory throughout. No reasonable ground appears in the record upon which to base the belief that the jury was misled. For us to conclude otherwise would be to disregard the plain and obvious. We would not be justified in reversing the lower Court on this issue unless we could say that the rights of the appellants were prejudiced.

Error in charging a proposition of law is not necessarily reversible. In order to constitute reversible error, the Court must be satisfied that there are reasonable grounds for supposing that the jury might have been misled to the prejudice of the appellant. *State v. Martin,* 122 S. C., 286, 115 S. E., 252; *Boggero v. Railroad Co.,* 64 S. C., 104, 41 S. E., 819; *Sharpton v. Railroad Co.,* 72 S. C., 162, 51 S. E., 553; *State v. Washington,* 80 S. C., 376, 61 S. E., 896; *State v. Johnson,* 159 S. C., 165, 156 S. E., 353; *Collins-Plass Thayer Co. v. Hewlett,* 109 S. C., 245, 253, 95 S. E., 510.

The foregoing rule of law is but another way of saying that where this Court can see from the entire record and the admissions of the defendants that the accused could not have been prejudiced by the alleged erroneous instruction, it will not reverse the judgment and set aside the verdict.

In *State v. Washington, supra,* error was charged because the trial Judge read to the jury in his charge a statute, the violation of which was not charged in the indictment, and it was argued that the reading of the statute, which was irrelevant to the issue being tried, was manifestly to the

prejudice of the defendant. In that case, the Court over-ruled the exception raising the issue, holding that if reading a statute not applicable to the issues in a case be error, it will not work a reversal unless it be made to appear that it was prejudicial.

While it is true that in the case at bar the kidnaping statute and the penalty were read, the reading of the penalty was merely incidental to the reading of the statute; not the slightest emphasis was placed upon it; it was merely read as a part of the general statute. The reading was preceded and succeeded by instructions dealing solely with the crime of murder, and it would be inconceivable to us in view of this record that the jury could have been confused. The jury was never told directly or indirectly that the appellants were charged with kidnaping. By their own admissions, the appellants had kidnaped Captain Sanders, but it is plainly evident that the reference to kidnaping, made by the Judge, and by the appellants in their requested instruction, was for the sole purpose of making it clear to the jury under the general law of conspiracy, which was fully charged —that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which naturally flow from it.

When the appellants entered the office of Captain Sanders, all of them were armed with improvised weapons, such as scissors' blades, and a pointed weapon similar to an ice-pick. They immediately bound the hands of the deceased behind his back, and one of the appellants testified that Captain Sanders was stabbed twice during the first hour in which he was held captive. He was led by two or more of the appellants time and again to the window of the room through which they communicated with State and prison officials, and it was stated that whenever Captain Sanders showed a reluctance to go to the window for the purpose of stating the demands of the appellants and requesting that they be given their freedom without molestation, he was stabbed in order to make him comply. The body bore five

wounds, two in his chest and three in his back. Three of these wounds penetrated no vital organ; some of them were made with a pointed round weapon like an ice-pick; the others were made with scissors' blades. The medical testimony showed that one of the wounds in his back penetrated his lung, resulting in profuse hemorrhage, and the doctor who made the examination testified that this wound was evidently made about an hour before Woods stabbed him to the heart just before the officers made entrance to the room. One of the appellants testified that the appellant Suttles also stabbed Captain Sanders during the three hours they held him bound; and that Captain Sanders called out more than once to the officers on the outside that he was being tortured.

With the exception of George Wingard all of the appellants are mature men, experienced in crime, and at the time of the homicide several of them were serving long terms. Some of them had previously made good their escape from other prisons.

When this crime was committed, Wingard was eighteen years of age and was serving a term for petty theivery. It may be reasonably inferred from the testimony that he enlisted in a bold and desperate enterprise upon the invitation of older men, the true significance and import of which he failed to fully realize because of his youth, inexperience, and immature judgment. Ameliorating considerations of this nature, however, fell within the exclusive province of the trial jury. This Court sitting as an appellate Court is confined to the correction of errors of law.

All exceptions are overruled.

Judgment affirmed.

Mr. Chief Justice Stabler and Mr. Justice Bonham concur.

Mr. Justice Baker dissents.

Mr. Justice Carter did not participate on account of illness.

MR. JUSTICE BAKER (dissenting).

The admitted facts in this case are that the defendants-appellants were on December 12, 1937, and for some time prior thereto, inmates of the South Carolina Penitentiary serving sentences imposed by Courts having jurisdiction; that the appellants entered into a conspiracy to escape from the Penitentiary, the plan or scheme being to seize Captain of the Guards, J. Olin Sanders, in his office, force him to call for an automobile and issue instructions that the gates of the prison be opened with no shots fired as appellants rode from the confines thereof. As a guarantee of this, Captain Sanders was to be forced to accompany appellants in the automobile until they felt safe in letting him out. In the fulfilment of the conspiracy, the appellants went into the office of Captain Sanders at about 8:10 o'clock on the morning of December 12, 1937, seized him, locked the doors to the office, and had him call for an automobile and issue instructions that he and appellants be allowed to ride from the prison unmolested. The superintendent of the penitentiary, and those acting under him, the Governor of the State, and the Adjutant General of the State, the latter two having been called there when the plight of Captain Sanders was discovered, refused to accede to the request of Captain Sanders, and the demand of the appellants. The appellants carried in the office of Captain Sanders a wooden pistol which had been made in their cell by the appellants Woods and Suttles, and which greatly resembled an automatic pistol of large calibre, the blades of scissors, and a sharp round instrument about like an ice pick. In consequence of the appearance of appellants being armed, and their threat to shoot any one attempting to enter the office of Captain Sanders, it was about three hours before any definite attempt to rout the appellants and rescue Captain Sanders was made, although communication by word of mouth was had with Captain Sanders and the appellants from time to time, the appellants demanding the automobile and at least temporary freedom, and Captain Sanders re-

questing same for them. When definite action was taken
to rout the appellants and take possession of them, and res-
cue Captain Sanders, by the shooting of tear gas bombs
into the office forcing appellants to surrender, it was found
that Captain Sanders had been mortally wounded by a stab
in his chest made with a round instrument, from which
wound he died within a few minutes. The appellant Woods
was the "leader", and the one who did most of the talking
as the representative of the appellants while they were in
the office of Captain Sanders.

Uncontroverted facts are that when Captain Sanders was
brought from his office immediately following the surren-
der of appellants, in addition to the mortal stab wound, the
immediate cause of his death, his body showed that he had
four other stab wounds, two in the chest and two on the
back. One of the wounds in the back had the appearance of
having been made with a round pointed instrument, the
other three wounds being "ovoid with lengthwise shape"
indicating that they were not made with a round instru-
ment. One of the "ovoid-lengthwise shape" wounds in the
back went into the lower lobe of the right lung, and this
wound, unattended, would probably have produced death.
The appellant, Wm. B. Woods, was the one had the round
instrument, and the one who dealt the death blow. When
the conspiracy to seize Captain Sanders and effectuate an
escape by the method hereinabove detailed was entered into,
it may or may not have been in contemplation of the con-
spirators that anyone be injured seriously. The wound
which was the immediate and proximate cause of the death
of Captain Sanders was inflicted, as aforesaid, by the ap-
pellant Woods, and was inflicted before the others knew or
had any reason to believe he (Woods) was going to stab
Captain Sanders at that time; and two or more of the other
appellants, when they realized what Woods was doing, re-
monstrated with him and grabbed him to prevent a further
assault and battery. It is questionable if the last and fatal

stab wound was inflicted in furtherance of the conspiracy to escape. All hope of escaping had been then abandoned.

The disputed facts are that the four stab wounds not the immediate cause of death were inflicted over the period of time in which Captain Sanders was held a prisoner in his office, and the serious stab wound in his back was inflicted about one hour prior to the surrender of appellants. Woods, the admitted spokesman for and leader of appellants, had threatened to kill Captain Sanders if their demand for an automobile and the gates to the prison opened was not complied with, and none of the appellants demurred to such statement.

The foregoing is a very brief synopsis of the main facts surrounding the killing of Captain Sanders gathered from a diligent study of the voluminous record in this case.

The appellants were at the January term, 1938, of the Court of General Sessions for Richland County, on an indictment charging them with the murder of Captain Sanders, tried, convicted of murder without recommendation to mercy, and by the Court sentenced to death by electrocution. They have appealed to this Court alleging errors on the part of the trial Judge, which alleged errors are set out in thirty-three exceptions, though in argument by appellants' counsel these exceptions have been grouped. Without undertaking to pass upon them *seriatim,* we partially follow such grouping.

Exceptions 1, 4, 19, 20, 25, 26 and 27 allege error in the refusal for a continuance of the case, (1) because adverse public sentiment was so strong against appellants at that time that it was impossible for them to obtain a fair and impartial trial, (2) that counsel for appellants had not been given sufficient time within which to prepare for trial. In the refusal for a continuance and change of venue, (a) in refusing to hear the motion for a change of venue on the ground that four days' notice of the motion had not been given, and in refusing to hear and grant the motion for change of venue under the circumstances and showing of

public sentiment, (b) in failing to grant motions for continuance and/or change of venue after having permitted appellants to be brought into the Court room shackled and bound, and clothed in prison garb, in the presence of the Court and jury, (c) that the perceptible scars on the person and head of the appellants inflicted immediately after the commission of the alleged crime, gave the appellants the outward appearance of criminals, and tended to prejudice the jury, and (d) that at the time of their arraignment, at the time a motion was made in the cause, and on the day of trial, appellants were brought into the Court room in the presence of the jury before whom they were to be tried, with heavy leather belts strapped around their waists, with heavy chains linked on the front, handcuffs on their arms and handcuffed down to those links on the belts, and that the handcuffs and chains were not removed from appellants until after coming into the Court room in full and clear view of the jurors.

We think it well at this point to state that the appellants were without counsel, and that the Court appointed and assigned to defend them (of course without remuneration) the gentlemen of the Richland County bar whose names appear in the record. We take pleasure in expressing the opinion that no attorneys could have more faithfully and zealously represented and guarded the rights of the appellants, for which they are to be commended.

Upon the call of the case for trial, appellants moved for a continuance on the ground set forth above, but at that time no motion was made for a change of venue. The first mention of change of venue was made by the State's attorneys when they presented affidavits tending to refute the charge that the defendants-appellants could not then obtain a fair and impartial trial. At that time counsel stated: "Now, we have some affidavits here, and your Honor will understand that they were prepared from a two-fold standpoint; one that they can get an impartial trial now, and the

other that they can get an impartial trial in Richland county."

It was during the selection of the jury that a motion was first made for a change of venue. We will advert to this later.

In the case of *State v. Francis et al.,* 152 S. C., 17, 25, 149 S. E., 348, 351, 70 A. L. R., 1133, one of the exceptions related to the failure of the trial Judge to grant a continuance. The Court through Associate Justice (thereafter Chief Justice) Blease had this to say:

"The cases sustaining the discretion of a trial Judge in motions of continuance are too numerous to require citation. We take the time, however, to refer to two of these cases.

"In the case of *State v. Lee,* 58 S. C., 335, 36 S. E., 706, two physicians certified that the nervous system of the defendant was much disturbed; that his physical condition was very bad, and they did not think he was in a fit condition to go to trial at the time. The circuit judge ordered the case to trial anyway, and stated that he was not impressed with the unsatisfactory, vague, and unsubstantial nature of the grounds for the motion, and that the defendant's own appearance and manner seemed to contradict the certificates of the physicians; and that the result showed conclusively that the defendant was strong enough to stand the ordeal of the trial. On appeal, this court refused to disturb the ruling below on the motion for continuance.

"In the case of *State v. Underwood,* 127 S. C., 1, 120 S. E., 719, one of the grounds on which a motion for continuance was based (was) the alleged hostile atmosphere surrounding the defendant, as evidenced by applause of the audience when the Judge refused a former motion for continuance. This court held there was no error.

"We see nothing in this case to change the general rule of the law, so often held by this court, that motions for continuance are addressed to the sound discretion of the trial judge,   *   *   *"

Again in *State v. Crosby,* 160 S. C., 301, 158 S. E., 685, 686, this Court held that "matters of continuance must be left to the sound discretion of the court, and unless it clearly appears from the record that there was an abuse of discretion, this court will sustain the action of the trial judge," citing among other cases, *State v. Francis, supra.*

In *State v. McDonald,* 184 S. C., 290, 192 S. E., 365, 368, the Court, through Mr. Justice Fishburne, as the organ, stated: "Applications for continuance are addressed to the sound discretion of the court, and it is a well-established rule in this commonwealth, and perhaps in all American jurisdictions, that the trial court's ruling in granting or in refusing a motion for a continuance in a criminal case will not be disturbed in the absence of a clear and conclusive showing of abuse of discretion." (Citing authorities.)

We have carefully read the record as to adverse public sentiment, and while the showing was strong, yet we cannot say that as a matter of law the trial Judge committed an abuse of discretion in refusing a continuance of the case. The showing made by appellants consisted largely of newspaper reports of the crime and pictures published of the scene of the crime; and affidavit of counsel that in their opinion defendants-appellants could not receive a fair and impartial trial based on the refusal of citizens to make an affidavit to this effect, although admitting to counsel that in their opinion appellants could not obtain a fair trial. The names of these citizens were not furnished the Court.

In passing upon an exception relating to the refusal of the trial Judge to grant defendants a continuance, this Court said in *State v. Rasor et al.,* 168 S. C., 221, 228, 229, 167 S. E., 396, 399, 86 A. L. R., 1237.

"The matters presented to the court as reasons for a continuance on the ground of adverse public sentiment were only statements in the nature of opinions and conclusions of the counsel. They were not supported by the usual proof given and required for the granting of such motions. See

*State v. Francis* 152 S. C., 17, 149 S. E., 348, 70 A. L. R., 1133. Zealous attorneys often become imbued with the feeling that their clients are being unjustly treated, and, to the credit of the legal profession, it may be said that a feeling of this kind tends to make the lawyer who has it more diligent in his representation of his client.

"While counsel stated that 'the citizens,' who had given him information, had refused to make affidavits, verifying the information obtained, there was no request that these citizens, who were unnamed, should be brought before the court and required to testify as to the information they had furnished. The Court had the power to summon 'these citizens' before it for the purpose of proper examination, and, no doubt, if their names had been given, and a request for their examination in open Court made, the presiding Judge would have granted it."

Viewing the completed record of the trial, we are forced to the conclusion that counsel for appellants did not require any additional time in which to prepare for the trial. The appellants were ably defended, and their counsel neither did nor failed to do anything with which they could reproach themselves, individually or collectively. And as stated in argument of counsel for respondent, no witness was named and no evidence called to the attention of the Court which could have been obtained by more time.

In the motion for a continuance on the ground that the appellants had been brought into Court handcuffed, etc., we quote from the record all that appears:

"We move for a continuance, further, on the ground that these defendants, at the time of their arraignment, and at the time they were brought into court for the purpose of hearing a motion on yesterday, and on this morning, were brought into the court room and into the presence of the jury before whom they are to be tried, with heavy leather belts strapped around their waists, about four inches wide with heavy chain links on the front, handcuffs on their

arms, and handcuffed down to those links on the belts—a condition that would naturally tend to prejudice a jury before whom they were to be tried; and that those handcuffs and other things were not removed until after coming into the presence of the Court, and being in clear view, and presenting every opportunity for clear examination, for thorough examination, in that condition, by the jurors."

"Mr. Graydon: One other thing I want put in the record, and I think Your Honor will verify this from the bench: That when the proceedings of this Court started, every time, that the prisoners were given free and absolute freedom of any chains or any handcuffs or anything else.

"The Court: Oh, yes; they were handcuffed when brought in here, but they were taken off."

The fact that these appellants were inmates of the penitentiary, if not known to all jurors, would inevitably become known to them from the facts necessarily developed upon the trial. It will be noted, however, that upon the commencement of any proceeding involving them, all chains and handcuffs were removed, which, if anything, would tend to bring notice to the jurors that appellants were to be tried upon the same footing as any other prisoner at the bar.

The source of the scars on the person and head of the appellants was allowed to be fully explained to the jury as having been unlawfully and unnecessarily inflicted by officers of the law at the time of their surrender, and could in no wise have prejudiced the jury against them.

The first mention of or motion for a change of venue from Richland County made by appellants was after six jurors had been accepted, and in the midst of the selection of the jury, and was made upon the same grounds as was the motion for a continuance, which had been refused.

The trial Judge held that he could not entertain the motion for that four days' notice thereof had not been given as required by the statute law of this State, and such notice not being waived by the State.

The statute (Section 35 of the Code), further provides: " * * * and the Circuit Judge shall have the power, upon application made to him by either party, upon proper cause shown, to shorten or extend the time for the hearing of such application for a change of venue." No application having been made to the trial Judge to shorten the time for the hearing of the motion, appellants or the appellants moving for a change of venue cannot complain that the trial Judge followed the statute law of the State. The record indicates that the trial Judge did not have the statute before him at the time he made his ruling, and it was not called to his attention that the statute permitted for cause shown the shortening of the time in which the motion could be made. Indeed, it would have been most unusual—without precedent so far as we are advised—to have entertained a motion of this nature while a jury was being selected and after several jurors had been accepted, except for some new matter arising after the commencement of the selection of the trial jury; or some matters which thereafter came to the knowledge of a defendant which he could not with diligence have learned of prior to entering upon the selection of the jury. In this case, as above stated, the motion was based upon the same grounds as was the motion for a continuance.

But aside from this, even had the trial Judge entertained and refused the motion it was within his judicial discretion; and in order to reverse such ruling it would have to appear that he exercised this judicial discretion in an arbitrary manner, which we could not do on the record herein.

Exceptions 8, 9 and 10 charge error in that the trial Judge charged the jury the law of kidnaping, and the penalty therefor, when the indictment did not charge the appellants with kidnaping.

The portion of the charge of the trial Judge objected to and made the basis of these exceptions is as follows:

"And in this connection, I charge you, gentlemen, that if you believe from the evidence, that the plan, if there was one, was to seize and hold Captain Sanders, in order to enable them to escape, and hold him as a hostage until escape was effected, then I charge you that such an act would be a felony and would constitute kidnaping.

"I am going to read you this Act with reference to kidnaping, an Act passed by your General Assembly, and approved the twenty-second day of March, 1937, 40 St. at Large, p. 137:

" 'Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever, and hold such person for ransom or reward, except in a case where a minor is seized or taken by a parent thereof, shall be guilty of a felony, and, upon conviction, shall suffer the punishment of death,' and it goes on to provide that upon recommendation to mercy the punishment shall be reduced to life imprisonment.

"I read Section 2: 'If two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of Section 1 of this Act' (the bulk of which I have read to you), 'and any of such persons do any overt act to wards carrying out such unlawful agreement, confederation, or conspiracy, each such person shall be guilty of a felony, and, upon conviction shall be punished in like manner as provided for the violation of said Section 1 of this Act.'

"Now, then, Mr. Foreman and gentlemen of the jury, the law is that if two or more persons form an agreement to commit a felony, any act which they do in pursuance of that scheme, the hand of one is the hand of both, and if they commit homicide while carrying out the commission of that felony, then the law says it is murder."

It is the position of appellants that the facts in the instant case do not come within the wording or spirit of the kidnaping statute. The facts are, briefly stated, that appellants conspired and combined to seize and hold captive J. Olin Sanders, captain of the guard, until he procured for them an

automobile for their transportation, the gates of the prison opened, orders from him that appellants not be fired upon, and to guarantee this would accompany them in the automobile until they were at least out of firing range. The conspiracy succeeded only to the extent of the seizure and holding captive of Captain Sanders in his office within the penitentiary walls.

We dare say that the exact circumstances above described were not in the minds of the law-making body of this State when the "kidnaping" statute of 1937 was enacted into law, but the statute is sufficiently broad to cover such a situation. Captain Sanders was unlawfully seized and confined, and was held for the procurement of an automobile and at least temporary freedom from the confines of a penal institution, something unpurchasable with money. Therefore, in this case, the ransom or reward was greater than that usually demanded, to wit, money.

The rule of law is that if two or more persons enter into a conspiracy to commit a felony, and they proceed to enter upon the commission of such felony, what one does, all do, and the act of one is the act of all. Therefore, while the indictment in this case charged murder, yet under the circumstances of this case, it was the duty of the trial Court to advise the jury if they believed from the evidence that there was a plan to seize and hold Captain Sanders in order to enable appellants to escape, and hold him as a hostage until escape was effected, then such act constituted kidnaping and was a felony.

In the commission of felonies, although they are interlinked, and both consummated, there is no merger of the crimes, and one committing two or more felonies in the consummation of one of the felonies may be tried and convicted of either of the felonies. It is only where the criminal act constitutes both a felony and misdemeanor that there is a merger of the lesser crime into the greater, and there can be no conviction except for the felony.

What we hold with reference to the trial Judge charging the penalty for kidnaping cannot avail the appellant, Wm. B. Woods, since from his own lips the Court and jury learn that he was the one who wielded the fatal blow, and without any justification—in fact, he neither claims justification nor does he ask for or expect mercy. According to his statement, the fatal blow was struck when he knew the entire plan for escape had been frustrated.

We have given a great deal of thought to the exception charging error by the trial Judge in reading to the jury the penalty for kidnaping which is identical with the penalty for murder. Under the admissions of appellants, they were guilty of kidnaping, and we cannot say that they were not prejudiced before the jury by the trial Judge reading that portion of the kidnaping statute fixing the punishment therefor. Of course, had the indictment charged kidnaping, then the jury would have been entitled to know the consequence of its verdict, but as aforesaid, the appellants were being tried on an indictment charging murder, and when they were told that for the kidnaping alone, the death penalty would be inflicted, unless the jury recommended to mercy, such information coming from the trial Court in his charge on the law applicable to the case for murder being tried, may have tended to convey to the minds of the jury that if the defendants-appellants were not deserving of the death penalty for murder, then they were for kidnaping. If we are in error in reaching this conclusion, it at least has the merit of being on the side of mercy, and only furnishes five of the appellants with another "day in Court."

There is yet another and more cogent reason why the defendants-appellants, except the appellant Woods, should be given a new trial. Counsel for the appellant Wingard requested the trial Judge to charge the jury "that if you find from the evidence that the death of Capt. Sanders was a fresh and independent product of the mind of one of the confederates, outside of, and foreign to, the common design, and growing out of his individual malice, then the re-

sponsibility for that act is the one who committed it, and those who are not guilty of such act and did not consent thereto, will not be guilty of that act."

The trial Judge, in refusing the request, stated and charged as follows:

"I refuse to charge you that proposition the way it is written, because I have already charged you practically the contrary. The design may not have been to kill at all, but if there was an unlawful scheme entered into, then what one did in furtherance of that, all did, and it wasn't necessary, Mr. Foreman and gentlemen, that the original design or scheme should have been to take human life, but if that became necessary and human life was taken while they were carrying out the design or scheme, then the act of one would be the act of all, the hand of one would be the hand of all.

" 'Whether or not the act was in furtherance of the common design'—I have numbered that Number 2—'or whether it was the natural and probable consequences flowing from the execution of the common design, is a question of fact to be decided by the jury.' "

We have no criticism of the law as charged in the first paragraph of the above-quoted portion of the trial Judge's charge, beginning with the second sentence, and as being applicable if the jury found that the stabbing was in furtherance of the scheme to escape, but the requested charge was also applicable, and not in conflict with the charge given, if the jury reached the conclusion that the stabbing was not in furtherance of the carrying out of the general scheme or design, and that it did not become necessary in the carrying out of the scheme and design.

The last portion of the above-quoted charge was a request to charge of the appellant Wingard immediately following the refused request.

While this was a request to charge on the part of Wingard, yet the trial Judge treated it as a request from all of

the defendants, and if he hadn't done so, in a case of this gravity, we would so treat it.

We quote with approval from the opinion by Mr. ■■ ■ Justice Fishburne in the recently decided case of *State v. Williams*, S. C., 199 S. E., 906, 908: "There can be no doubt of the general rule of law that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which naturally or necessarily flow from it, and that if he combines and confederates with others to accomplish an illegal purpose he is liable *criminaliter* for everything done by his confederates which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though what was done was not intended as a part of the original design or common plan." Citing authorities.

That the above is a correct statement of the general law to applicable facts cannot be gainsaid. But in this case, one of the reasonable inferences which could be drawn from the testimony was that after tear gas bombs had been shot into the office of Captain Sanders, and when all hope of effecting an escape through the seizure of the officer had been vanquished, the appellant Woods, without any warning to the others, deliberately stabbed Captain Sanders, which stab wound produced his death. And that at the time of this stabbing he did it over the protest of three of the appellants, Suttles, Bair and Crans, and before they could prevent it. It does not appear that the others in the smoke or gas filled room saw or realized what was taking place. Therefore, under the testimony in this case the defendants-appellants, other than Woods, were entitled to the benefit of such charge. The authority for this proposed charge as being good law may be found in 11 Amer. Juris., 549.

Having reached the conclusion that a new trial should be granted the appellants, Suttles, Bair, Crans, Wingard and Moorman, it would be unnecessary to pass upon the other exceptions, but for the appellant Woods. This is also

true as to some of the other exceptions hereinabove passed upon.

Exception 14 alleges error in refusing the motion of appellants to dismiss the array of petit jurors on the ground that they were not drawn from a box prepared in the manner required by law.

When this question arose, the trial Judge stopped all proceedings and took testimony in open Court as to the manner in which the names in the jury box were prepared, and reached the conclusion that there had been a substantial compliance with the law. In this holding we are in accord.

Exception 15 alleges error in refusing the motion for a new trial on the ground that one or more jurors had expressed an opinion hostile to appellants prior to the trial, and failed to disclose same to the Court upon examination when called for service.

Upon it coming to the attention of the trial Judge that it was claimed that one of the jurors who served on the trial jury had stated, after he had been drawn and served with a subpoena to appear as a juror, in discussing the case, "Well, I know where they are going if I get on the case, they all are going to the electric chair," or words to that effect, the Judge had this juror appear, as also his accuser and another alleged witness, and took their testimony in open Court, and after due consideration reached the conclusion that the juror was a competent and fair juror.

The trial Judge had the advantage of observing and hearing the juror and witnesses testify, and we would not undertake to say that he did not reach a proper conclusion. Following the filing of the opinion of this Court in *State v. Kennedy*, 177 S. C., 195, 181 S. E., 35, 40, attorneys for Kennedy filed with this Court his petition for order staying remittitur for the purpose of allowing a motion to be made in the Circuit Court for a new trial on after-discovered evidence. The petition was granted and argument on the motion was made based upon alleged "after-discovered evi-

dence" that one of the jurors who sat upon defendant's case had made a disqualifying statement prior to being accepted upon the jury. In refusing the motion of appellant this Court stated in a *per curiam* order, among other things, the following:

"After a verdict has been rendered, and the jurors have dispersed, their solemn act should not be overthrown and set aside except upon the most convincing showing of prejudice to the defendant—amounting to a denial of a fair and impartial trial. Certainly after the rendition of a verdict, affidavits attacking the integrity of a juror should be received with great caution, deliberation, and circumspection. In this case every precaution known to the law was duly taken and observed in order that the defendant might have that fair and impartial trial guaranteed to him by the Constitution and laws of this State.

"We are impressed with the fine insight- and sound reasoning of Judge Robert Aldrich, Acting Associate Justice, in *State v. Jones,* 89 S. C., 41, 71 S. E., 291, 294, Ann. Cas., 1912-D, 1298, where he said: 'Nothing is of more frequent occurrence than for men, upon sudden impulse or upon *ex parte* representations of a case, to give expression to their opinions in reference thereto, often in the most violent and feeling manner, and yet these same men, when sworn as jurors and given the opportunity to make up their minds from the evidence adduced, the arguments of counsel and the charge of the judge, and forced to act upon the solemnity of their oaths and the responsibility of their office, make the most exemplary jurors, and frequently decide in opposition to their preconceived opinions.' "

Exceptions 21 and 22 alleged error in permitting jurors who stated they had formed an opinion and discussed the case to sit upon the jury.

All jurors were sworn on their *voir dire,* and none were accepted who did not state he would be guided by the testimony and would follow the law. It was

within the discretion of the trial Judge if a juror should be presented. As was said in *State v. Faries*, 125 S. C., 281, 118 S. E., 620, and quoted with approval in *State v. McDonald, supra:* " 'The weight to be attached to the juror's statements was for the Circuit Judge. The manner and bearing of the juror, nature's stamp of character on form and countenance, are evidential exhibits for the consideration of the Circuit Judge, which may be more indicative of the juror's real attitude than his words. Those things cannot adequately be spread upon the record.' "

Attention is invited to other cases cited in the McDonald opinion.

It does not appear necessary to refer but to two other exceptions, these alleging error in refusing the motion of appellants to have the State's counsel to deliver to them statements made by appellants soon after the commission of the crime; and alleged error in the number of challenges allowed to the jury.

It is sufficient to say that under Woods' testimony on the trial of the case no former statement made by him or any of his co-defendants could have been of any benefit to him.

The number of challenges of jurors allowed a defendant or defendants is governed by statute, and the statute was followed by the trial Court.

We have considered all exceptions, and the judgment of this Court should be that as to the appellant, Wm. B. Woods, all exceptions are overruled, and the judgment of the Circuit Court be, and the same is, affirmed. As to the other appellants, for the reasons herein stated, the judgment should be reversed, and the case remanded for a new trial.

NOTE: The foregoing opinion was written as and for the main opinion, but by reason of the dissent by a majority of the Court, it becomes the dissenting opinion insofar as it decrees a new trial for any of the defendants.