16960

THE STATE, Respondent, v. GUY V. WHITENER, Appellant.

(89 S. E. (2d) 701)

See also 225 S. C. 244, 81 S. E. (2d) 784.

246

*Messrs. C. T. Graydon,* of Columbia, and *R. Aubrey Harley,* of Newberry, *for Appellant,*

*Messrs. T. Pou Taylor, Solicitor,* and *John W. Foard, Jr., Assistant Solicitor,* of Columbia, *for Respondent,*

February 8, 1955.

LEGGE, Justice.

At the December, 1953, term of the Court of General Sessions for Richland County, appellant was indicted on three counts, the first charging rape, the second charging carnal knowledge of a woman child under the age of fourteen and above the age of ten years, and the third charging him with aiding and abetting another in the carnal knowledge of the same child within a few hours after appellant had raped her.

On December 14, 1953, appellant gave notice of a motion for change of venue, upon the ground that because of the unfavorable publicity that had been given to the charges against him in the press, on the radio, and otherwise, he could not obtain a fair and impartial trial in Richland County. The motion was heard on December 16, 1953, and refused. He then moved for a continuance upon the following grounds:

(1) That, as disclosed by the affidavits in support of the motion for change of venue, he could not at that time obtain a fair and impartial trial; (2) That the cause would require from three to five days for trial and would therefore not be concluded until a day or two before Christmas, which would be unfair to the defendant; (3) That his counsel had received information to the effect that there were two or three persons, living without the State, who might be material witnesses; and (4) That the solicitor had signed the indictment on the sheet containing the third count, and that the third count, which would thus necessarily have to be in the hands of the jury along with the first two, was such as to be prejudicial to the defendant. This motion was heard on December 16, and refused.

On December 17, when the case was called for trial, appellant's counsel moved for a continuance upon the ground that appellant was so ill that his life would be endangered if he were forced to trial at that time. In support of the motion, his physician, Dr. A. W. Welling of Newberry, South

Carolina, testified that appellant at that time had a virus pneumonia and that it would endanger his life to attend trial that morning. Two of the county physicians of Richland county who had been sent by order of the court to the hospital at Newberry, where appellant was, testified that their examination that morning revealed that he had a slight fever, and that he was probably suffering from influenza; that they would not advise his standing trial at that time, but that under proper care and treatment he should be able to stand trial within from three to five days. The case was then continued to the morning of Monday, December 21, 1953.

At the call of the case for trial on December 21, appellant's counsel again moved for a continuance on the ground that he was too ill to stand trial. After consideration of affidavits of Dr. A. W. Welling and Dr. B. M. Montgomery, submitted in support of the motion, the court again sent the two county physicians to Newberry for the purpose of examining him; and upon their return they testified on the afternoon of the same day that his temperature was less than one degree above normal, and that they had found no evidence of virus pneumonia, pneumonitis, or any condition that in their opinion would make it dangerous to his life or health to stand trial at that time. The motion for continuance was then refused and the case ordered for trial on December 22, 1953.

Upon the call of the case for trial on the morning of December 22, appellant's counsel stated that appellant was in the court house, but was having a chill and high fever. The county physicians were again called and, after having examined him, testified that his temperature was perfectly normal and that he was, in their opinion, able to face trial. Appellant was then called to the witness stand by his counsel, and testified that he had had a severe attack of chills and fever the day before, and had had a "weak spell" a few minutes before. His wife was also sworn and testified that he had had a chill while at the hospital the afternoon be-

fore, and that he had had a weak spell a few minutes before. Thereupon appellant's counsel again moved for a continuance on the ground that he was physicially unable to go to trial; and the motion was refused.

Appellant moved:

1. To quash the indictment, upon the ground that it charged entirely distinct offenses;

2. To require the state to elect on which of the three counts it would go to trial; and

3. To strike the third count as charging an offense not forming a part of or connected with those set forth in the first two counts.

The motion to quash was refused, and the motion to require election was granted. Thereupon the state elected to go to trial on the first count. Appellant's counsel then stated that they desired to go to trial on counts one and two, and that count three be stricken out, whereupon, and at their request, it was so ordered.

The trial began at 2:30 p.m. on December 22; the taking of testimony was completed on December 23; and the case went to the jury at 11:35 a.m. on December 24. At 1:30 p.m. the jury returned, requesting clarification of the difference between count one and count two of the indictment; and having received instructions in that regard, they retired, and at 1:50 p.m. on December 24, 1953, returned a verdict of "Guilty of rape, with recommendation to the mercy of the court." A motion for a new trial was thereafter made and refused and appellant was thereupon sentenced to serve a term of fourteen years in the South Carolina Penitentiary or a like term upon the public works of Richland County. He now appeals to this court on numerous exceptions, which will be hereinafter discussed.

Pending the hearing of the appeal, appellant gave notice that he would move before this court for an order suspending the appeal and transferring the cause to the Court of General Sessions for Richland County for the purpose of

allowing him to move there for a new trial upon after discovered evidence. The motion and the appeal on the merits were argued together before this court at the October 1954 term; and the motion will be adverted to in the course of this opinion.

The prosecuting witness, eleven years old, lived with her mother, her fourteen year old brother, and her step-father, a painter, on Jones Street, in the eastern part of the City of Columbia, whither they had moved from West Columbia some two weeks before September 17, 1953, the date of the alleged offense.

Appellant, a lumber manufacturer, forty-nine years of age, and married, lived in Newberry, South Carolina. He had known the prosecuting witness and her family for about two years, his first acquaintance with them having occurred in connection with the painting of a house for him; had visited them at their home in West Columbia; and, when they were preparing to move to the Columbia address, he had, at the request of the prosecuting witness' mother, driven in company with the prosecuting witness and another member of the family to see the new location.

The prosecuting witness testified, in substance, as follows:

On the afternoon of September 17, 1953, while she was waiting to catch a bus to go on an errand for her mother to a laundry in West Columbia, appellant drove up in his car and offered her a ride. He took her to Hunter's Motor Court, went to the office, and, having gotten a key to cabin No. 3, drove there, and in spite of her remonstrance, took her by the wrist and made her go in with him. He locked the door, offered her a drink of whiskey, which she refused, and then told her to take off her clothes. She refused, and he "took them off for me," and then "he told me to go lay in the bed, and I did, and he took off his clothes," and proceeded to have sexual intercourse with her. She testified that when he started to get on top of her "he put my hands behind my head and kept trying to mash down, and I told

him it was hurting, and I started crying." After about an hour of this, he told her to go into the bathroom and wipe herself off, which she did; ,and then at his request she lay on the bed and he "played with" her for some time. Then he told her to put on her clothes, and she did so, and they left the motor court in his car. At or near Sawyer's Drug Store there were several boys, one of whom, H. B. Sharpe, appellant invited to get in and ride around with them, which he did. After a while, appellant told Sharpe to get another boy and he would be back in five or ten minutes for them. Sharpe got out of the car, and appellant, after driving around with her, came back and picked up Sharpe and another boy, James B. Coleman. She testified that she did not know either of these boys, and that appellant introduced her to them. They all went back to Hunter's Motor Court, and to the same room; and there, in the presence of the two boys, appellant committed an unnatural sexual act upon her with his mouth.

The testimony of the prosecutrix was substantially corroborated by that of Sharpe and Coleman, both of whom testified also that when they went into the room the bed was in disorder, and that appellant stated to them that he had already had intercourse with her. Each of these boys gave his age as sixteen years.

They left the motor court between 9:00 and 10:00 o'clock that evening, and appellant drove back to the drug store, where Sharpe and Coleman got out. He was driving the prosecutrix to her home when he was stopped by a city patrolman who, under orders from headquarters, was on the lookout for this car. Appellant was taken to police headquarters in a police car and the prosecutrix was taken there in appellant's car by police officer Derrick. As Derrick was getting out of the car at headquarters, there fell out of the car a key, to which was attached a plastic tag bearing the inscription "Hunter's Motor Court, 2322 Two Notch Road, Columbia, S. C., 13." Later that evening, having placed appellant in jail and having talked with the prosecutrix, De-

tective Rawlinson went with the prosecutrix and Detective Fulmer to Hunter's Motor Court. Key No. 13 proved to be a master key to any room in the motor court; and with it they opened Room No. 3, which consisted, in fact, of two rooms and a bath, one room being a combination living room and bedroom, containing one bed, and the other a bedroom with two beds. The first room was in good order; in the other, one of the beds was in disarray, the sheet on it was smeared and stained, and its pillow was on the other bed, the top spread of which, although rumpled, had not been removed. The bathroom was in disorder, and on its floor were two or three towels. An empty whiskey bottle and several glasses were on the bureau, and on one of the beds was a man's undershirt, later identified by the appellant as his own. From the operator of the motor court was obtained the registration card for Room No. 3, which was dated 9-16-53 and signed "John L. Baker." This signature was later identified by appellant as his own.

Rawlinson testified that upon his return from the motor court to police headquarters he told appellant what he had found and discussed the matter with him at length in the presence of another member of the police force, Mr. Shealey. To quote from Rawlinson's testimony:

"I talked with him, and Mr. Shealey was present, and he made the statement that the bed was messed up, but that he didn't do all that himself; that somebody else had a part in it, and I told him that the charge was straight rape, and he said, 'That's awful severe, pretty rough,' and I said, 'Well, that's what it looks like to me, and I am trying to be fair to you.' He said, 'Well, I am guilty of carnal knowledge or contributing to juvenile delinquency'."

E. A. Shealey, who was present during the conversation between Rawlinson and the appellant, testified: "He said he wouldn't plead guilty to rape. Chief Rawlinson asked him about the rape, and he said he wouldn't plead guilty to rape, but that he had been with the little girl."

The prosecutrix was examined by one of the county physicians at his office about 1:00 o'clock a.m. on September 18. His examination revealed no evidence of injury, but disclosed more than the average amount of dilatation of the female organs, a condition that in his opinion had existed for some time. In the opinion of another county physician, who examined her five days later, this condition, which included a completely healed rupture of the hymen, had existed for at least some weeks. Smears from the prosecutrix and the appellant were taken an hour or two after midnight of September 17 and sent later in the morning of the 18th to the Columbia Hospital for examination. In both instances the hospital reported that no spermatozoa was found. Examination of the sheet and towels taken from the room at the motor court, and also of the panties worn by the prosecutrix, was made at the laboratory of the State Law Enforcement Department on the morning of September 18, about 9:00 o'clock. It revealed semen stains on the sheet and one towel and on the panties.

Appellant testified, in substance, as follows:

On September 17 he drove from his farm in Jasper County to Columbia, bringing some venison to give to the family of the prosecutrix. He arrived at their home between 4:30 and 5:00 p. m., visited with them for fifteen or twenty minutes, and then left to go to West Columbia, where he had a business appointment with a man named John L. Baker, who was to meet him at Hunter's Motor Court at 5:30. He also was going to the Van Lott Company's place of business in West Columbia to see about replacing a wornout tractor clutch. As he was about to leave, the prosecutrix came out to his car and said that her mother wanted her to go to West Columbia to get some laundry, and that she would go with him. He drove first to Hunter's Motor Court, where he asked Mr. Hunter if he had received a phone call for him and if Mr. Baker had reserved a room. Receiving a negative answer, he told Mr. Hunter that he would take a room in Baker's name, which he did After

he had registered, a phone call came for him, which he answered; and then he talked with Mr. Hunter for five or ten minutes, at the end of which time Mr. Hunter gave him Key No. 13, saying that it was a pass-key, and that his room, the last available, was No. 3. Appellant, noticing that it was then 5:45 p. m., drove to Room 3, which was about a car length from the office, got out with his brief-case and, having first gotten a pitcher of ice, went into the front room, leaving the prosecutrix in the car. The day being very hot, he took off his shirt and undershirt and went into the bathroom, where, having put some ice in the basin, he proceeded to sponge himself down to the waist. When he walked back into the room, the little girl had come in. He said: "What are you doing here?" She replied: "I just wanted to look around and see. This sure is a pretty room." He then told her to go back and get in the car, that he would be out in a few minutes, and that he would have to hurry over to Van Lott's before they closed. Then he put on a shirt, leaving his undershirt off, got a paper out of his brief-case, left the brief-case in the room, and drove with the girl to the Van Lott Company's place of business, which he found closed. They next drove to the laundry, which also was closed. Then the girl said: "Let's ride around and see if I can see any of my schoolmates or boy friends"; and he drove around where she directed. He drove back to Columbia, and on the way to Hendley Homes, where Baker lived, they were passing through Olympia, when she said she knew somebody there. He suggested that they stop at Shep's Drive-In and get something to eat, but she replied that she didn't want anything and would stay in the car and see if her boy friend came along. Appellant went into the drive-in, ate a hamburger, and came out at 6:45 p.m. The girl then asked him to drive about half a block to where there was a crowd of boys. One of them, whom Whitener knew only by sight, and whose name he learned, at the trial, was "H. B.", came up and spoke to him. The girl asked this boy where a certain other boy, whose name ap-

pellant did not recall, was; and "H. B." said that maybe "if we rode around a bit" he could find him. So "H. B." got in the car and directed appellant where to drive, and they came back without having found the other boy; whereupon "H. B." said: "If you will come back in a little while, maybe I can find him." Appellant then drove to Baker's home, found that he wasn't there, and then drove back to where they had left "H. B." He was there with another boy, named Jimmy, and said that he couldn't find the boy for whom he had been looking. The girl told appellant to let the two boys, "H. B." and Jimmy, get in the car and ride around with them. Appellant replied that he would do so, but that he would have to ride over to the motor court to see if Baker was there, and if he should not be there he would have to go back to Baker's house. So appellant drove back to Room 3 at Hunter's Motor Court, and they all went in. Appellant went into the bathroom, and the girl and two boys went into the bedroom. From the bathroom, appellant went into the living room, where he sat in a chair and read some reports that were in his brief-case. The door between the two rooms was ajar, but appellant did not go into, or look into, the bedroom. He heard the children laughing and talking in the bedroom. Appellant went outside once to the self-service soft drink stand. He read his reports for some fifteen or twenty minutes, and then the children came out of the bedroom, and he said: "Baker hasn't come, and I have to go. Let's go." He then took the two boys back to where he had picked them up, put them out there and drove to the apartment next door to Baker's, where some woman's voice informed him that Baker had not yet come home. He then started to drive around the Belt Line to carry the little girl home, and was on the way to her house when he was stopped by the police patrol car. He denied having made any statement to Rawlinson except to request that Rawlinson get a doctor to examine him. Appellant denied that he had ever touched the prosecutrix. He testified that he had a contract with John L. Baker, to whom he had advanced

some money. Appellant had known Hunter for a couple of years and had stayed at his motor court before. He had registered there in Baker's name some two weeks before, when he had had an appointment to meet him there and Baker had been a little late.

Mr. Ferris Hunter, the owner and operator of Hunter's Motor Court, testified that he had rented Room 3, his last vacancy, to appellant at some time between 5:00 and 7:00 o'clock on the afternoon of September 17; that his own house was some thirty feet from Room No. 3; that after renting Room No. 3 to appellant, Hunter stayed in the office of the motor court for about half an hour and then went to his house, where he remained for about three quarters of an hour shaving and bathing, during which time he heard nothing, although his window of the bathroom was open. He returned to the office, stayed there about half an hour, and left the motor court about 8:30 or 8:45 p. m., returning about 10:00 p. m. No complaint was made to him by any guest of the motor court. When appellant first came into Hunter's office, he asked if John L. Baker had been there. While appellant was in the office the telephone rang, and Hunter answered it. The person calling asked if appellant was there, and Hunter then handed the phone to appellant, who talked with the other party.

Dr. A. W. Welling, appellant's personal physician, testified that he examined appellant at the jail about 1:00 or 2:00 a. m. on September 18; that he saw no evidence in the way of bruises or otherwise that would indicate recent sexual intercourse.

The following evidence was adduced by the State in reply:

H. B. Sharpe, recalled, testified that he saw appellant take off his undershirt after appellant and the witness and Coleman and the girl had gone into the room at the motor court.

James B. Coleman, recalled, testified that he also saw appellant take off his undershirt; that during the entire time that he and Sharpe and the girl were in the bedroom appel-

lant was there also; and that appellant had said nothing about having a business engagement.

The prosecutrix, recalled, denied that she had asked appellant to take her to look for any boy friends; and she corroborated Coleman's testimony to the effect that appellant was in the bedroom during all the time that she and the two boys were there.

The motion for suspension of the appeal and transfer of the cause to the lower court for the purposes of a motion for new trial on after discovered evidence was based upon:

1. An affidavit of M. B. Tucker, a prospective juror who, upon the drawing of the jury for the case at bar, had been acceptable to the State but was not accepted by the defense; and

2. An affidavit by the prosecutrix repudiating her testimony at the trial.

Following is the substance of Mr. Tucker's affidavit:

In 1933 he was engaged in business in Newberry, Laurens, Sumter and Clarendon counties as wholesale and retail dealer for the Pure Oil Company; and in that year he established his residence in Newberry, where he operated a filling station and a bulk plant. Here he became acquainted with appellant, who was a substantial customer, and, while they were not close friends, their business and social relations were cordial. In the latter part of the same year, 1933, Tucker sold his business in Newberry and Laurens counties and moved to Sumter, South Carolina, where he lived for two years. In 1935 he moved to Columbia, where he has resided ever since. In September, 1953, having read in the newspaper of appellant's arrest, he visited him at the jail, carrying him some fruit, and talked with him there for some thirty or forty minutes. At the trial in December he was accepted as a juror by the State but rejected by appellant, who apparently did not recognize him although he was standing within four or five feet. After the trial Tucker saw appellant in the jail and asked why he had been rejected

as a juror, to which appellant replied that he had not seen him at all, and that he had been sick and had not known what he was doing.

This affidavit furnishes no sufficient basis for the motion. It will be recalled that when the case was called for trial appellant moved for continuance upon the ground of illness, and under the court's order he was then and there examined by two physicians, who pronounced him physically able to stand trial. The presiding judge thereupon ordered the trial to proceed; and there is nothing in the record of appellant's testimony to suggest that he was not in full possession of his faculties. It does not appear from the affidavit that Mr. Tucker maintained contact with the appellant, either in business or socially, after 1933, when Mr. Tucker left Newberry. For all that the affidavit discloses, he never saw appellant again until September, 1953, when he visited him in the Richland County jail. His conversation with him in the same jail after the trial must have taken place not later than March 30, 1954, when appellant was released on bond. The incident related in the affidavit must, therefore, have been known to appellant as well as to the affiant some six months prior to September 29, 1954, the date of the affidavit and of the motion for transfer of the cause.

The affidavit of the prosecutrix is to the effect that on the night of the arrest she was forced by Detective Rawlinson, under threat that she would be kept in jail, to sign a false statement incriminating the appellant; that when they took her home that night she told her mother that she had told the police that appellant hadn't bothered her; that a few days later she was taken before a magistrate in the solicitor's office, and then taken to the South Carolina Industrial School for White Girls, where she stayed until after the trial; that every night, after all the other girls had gone to bed, she was required by her matron, Mrs. Kinlaw, to study "what they had written for me to say in court"; that whenever she cried her teacher would slap her face; that

when she was taken to the court house Detective Rawlinson and Solicitor Taylor took her in a room and told her that, if she didn't say what was on the paper she had studied, they would keep her at the Industrial School for the rest of her life; and that while she was in the room Detective Rawlinson gave her a handful of money.

The averments of this affidavit are thoroughly and convincingly refuted by affidavits of Detective Rawlinson, Detective Fulmer, Officer R. A. Shealey, Magistrate Cal M. Lawson, Mrs. Florence S. Mertz, Superintendent of the South Carolina Industrial School for Girls, Miss Kinlaw, one of the matrons of said school, E. M. Suber, of the South Carolina Law Enforcement Division, Mr. John W. Foard, Jr., Assistant Solicitor, and Mr. T. P. Taylor, Solicitor of the Fifth Judicial Circuit, and an affidavit of a married sister of the prosecutrix. It is unnecessary to review these affidavits in detail. From Solicitor Taylor's affidavit it appears, among other things, that a day or two after the arrest he called, in company with Detective Rawlinson, at the home of the child's mother, and the prosecutrix then and there in her mother's presence related in detail what had occurred, substantially as she later testified; that the solicitor then suggested to the mother that in the interest of the child and of society the child should be placed in some institution until the case was ended, to which the mother agreed; that on September 25, 1953, the mother brought her to his office, where under a warrant issued by Magistrate Lawson she was ordered placed in the Industrial School for Girls and held there as a material witness in default of $5,000.00 bond, all of which was fully understood and agreed to by the mother; that thereafter on November 25, 1953, the mother caused to be instituted a proceeding in habeas corpus for the release of the prosecutrix, which proceeding was dismissed by Judge Henderson; that thereafter, on December 5, 1953, Magistrate Lawson increased the bond to $7,000.00, and before the bond could be posted, the solicitor instituted an action by the Superintendent of

the South Carolina Industrial School, as plaintiff, against the prosecutrix and her mother, praying for the continued custody of the prosecutrix; that after fully hearing argument Judge Henderson ordered that the child remain in the Industrial School and ordered the cause referred to the Master for Richland County; and that before the matter could be heard before the Master the Court of General Sessions convened and any further effort to obtain the child's release from the Industrial School was thus forestalled.

■ Recantation of testimony ordinarily is unreliable and should be subjected to the closest scrutiny when offered as ground for a new trial. *State v. Rhodes,* 44 S. C. 325, 21 S. E. 807, 22 S. E. 306; *State v. Mathis,* 174 S. C. 344, 177 S. E. 318; *Taylor v. Ross,* 150 Ohio St. 448, 83 N. E. (2d) 222, 10 A. L. R. (2d) 377; *People v. Caruso,* 172 Misc. 191, 14 N. Y. S. (2d) 349; *Commonwealth v. Gwizdoski,* 284 Mass. 578, 188 N. E. 383; *Keeley v. Great Northern Railroad Co.,* 139 Wis. 448, 121 N. W. 167; *Rigsby v. State,* 55 Okl. Cr. 61, 24 P. (2d) 1016.

If it be true, as the prosecutrix would now have us believe, that when she was brought home on the night of September 17, 1953, she told her mother that appellant hadn't "bothered" her, and also told her mother that she had told the police so, but that they had made her sign a false statement incriminating him, it is passing strange that the mother did not so testify at the trial and that she does not now corroborate her daughter's affidavit. Moreover, the issue of whether or not the prosecutrix had made any such exculpatory statement was before the jury at the trial, as the following excerpts from her testimony will show:

Under cross examination:

"Q. Now, I ask you this question, and I put you on notice that I expect to contradict you: Haven't you on more than one occasion told people, including your mother and others, that you didn't accuse Mr. Whitener of doing you any harm; that he had done you no harm; and that you had not been attacked by him?

"The Socilitor: Now, if your Honor pleases, in fairness to the little girl, if he is laying any foundation to contradict her, he has to state, within reason, the time and the place and the person to whom it was made.

"The Court: That would be true if he undertakes to contradict her. That point will come up if he undertakes to contradict her.

"Mr. Graydon: I ask you is that your signature on here (indicating)?

"The Witness: Yes, sir."

Thereupon counsel for the appellant offered, for identification only, a handwritten statement signed by the prosecutrix, and the same was so marked. But the statement was never introduced or offered in evidence. On redirect examination the prosecutrix testified that on the Wednesday preceding the trial her sister had brought this paper to her at the Industrial School and had requested her to sign it, which she had done without knowledge of its contents. The following colloquy ensued:

"The Solicitor: Would you mind letting me see it, gentlemen?

"Mr. Graydon: We haven't put it in evidence.

"The Solicitor: Well, I would like to see it, and maybe I will offer it.

"Mr. Graydon: The paper is ours, and we have identified it. If we see fit, at the proper time we may introduce it in evidence and we may not."

The showing in support of the motion to transfer the cause to the lower court for the purpose of a motion for new trial is insufficient, and the motion is denied.

Appellant's exceptions, fifty in number, have been separately considered, but need not be separately discussed. As stated in his brief, they involve nine questions, which we shall take up in their order.

He first contends that the trial judge erred in re-
fusing to grant his motion for change of venue, which
was based, as we have stated, upon the ground that
because of the unfavorable publicity given to the charges
against him he could not obtain a fair and impartial trial
in Richland County. Such a motion is addressed to the
court's discretion. *State v. Woods,* 189 S. C. 281, 1 S. E.
(2d) 190; *State v. Thomas,* 198 S. C. 519, 18 S. E. (2d)
369; *State v. Gantt,* 223 S. C. 431, 76 S. E. (2d) 674.
Careful consideration of the affidavits and newspaper clip-
pings submitted in support of the motion, and of the affi-
davits submitted by the State contra, convinces us that the
learned trial judge wisely exercised his judicial discretion
in refusing to grant the motion.

Nor has appellant shown abuse of discretion in the
trial judge's refusal to continue the case beyond
December 22 because of the appellant's physical
condition and because of the feeling of prejudice against
him. The several motions for continuance on the ground of
illness have already been adverted to, and need no further
discussion; and the claim of prejudice was properly
disposed of on the motion for change of venue. Like-
wise without merit is appellant's contention that the
trial judge erred in not continuing the case because the
proximity of Christmas (Exceptions 8 and 9), and in re-
fusing to declare a mistrial on appellant's motion at the con-
clusion of the State's case because it was then apparent that
the trial could not be finished before Christmas Eve (Excep-
tion 36).

Appellant insists that the trial judge erred (Exception
10) in refusing to quash the indictment, upon the ground
that it contained three counts each charging a separate and
distinct offense; and further (Exception 12) in refusing to
physically remove the third count or permit the solicitor to
paste a sheet of paper over that count so that the jury would
not have it before them in the jury room.

"The rule in this state is that distinct offenses—felonies or misdemeanors—may be charged in separate counts of the same indictment, whether growing out of the same transaction or not. If the several offenses charged do not grow out of the same transaction, then the proper practice is to require the prosecuting officer to elect upon which count he will proceed. But, when several offenses charged grow out of the same transaction, then the prosecuting officer is not required to elect, and the court instructs the jury to pass upon the several counts separately, and write their verdict accordingly." *State v. Lee,* 147 S. C. 480, 145 S. E. 285, 286. See also *State v. Maxey,* 218 S. C. 106, 62 S. E. (2d) 100. The motion to quash was properly refused.

As to Exception 12, the record shows that the solicitor's signature was on the same page that contained the third count, and that, in response to the request by counsel for appellant that this count be physically eliminated, the trial judge suggested that, if counsel would agree, this count might be removed and the solicitor could sign at the end of the second count.

Counsel being unable to agree to this, the solicitor offered to paste a piece of paper over the third count, but counsel for appellant refused to agree. We have been directed to no authority, and have found none, for the proposition that a stricken count must be physically removed from the indictment. It is sufficient in our opinion, that the trial judge instruct the jury to disregard it, as was done in the instant case.

Appellant charges (Exception 11) that the trial judge erred in refusing to grant the request of his counsel that the jury be excluded during the argument of the motion to quash and the motion to require election. This was a matter addressed to the court's discretion. Cf. *Roach v. Williams,* 109 S. C. 29, 95 S. E. 120. No abuse of discretion has been shown.

By several exceptions appellant charges error in admitting evidence of the unnatural sexual act committed upon the prosecutrix some hours after the original offense. There is no merit in these exceptions. While it is true as a general rule that in a trial for one crime testimony of other distinct and independent crimes is not admissible, exception is made where such testimony tends to establish a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others. Such exception is generally applied in cases involving sexual crimes, where evidence of acts prior and subsequent to the act charged in the indictment is held admissible as tending to show continued illicit intercourse between the same parties. *State v. Richey,* 88 S. C. 239, 70 S. E. 729. Over objection by appellant's counsel, the trial judge permitted two physicians to testify that an unnatural sexual act such as had been testified to would tend to withdraw spermatozoa from the vagina. This testimony was properly admitted, in view of the fact that Dr. Davis, who had examined the prosecutrix shortly after the arrest, had testified to the absence of spermatozoa. Nor was there error in permitting one of the physicians to testify that in the same person there may exist the desire for normal as well as unnatural sexual intercourse.

Fourteen exceptions are grouped by appellant in his brief under Question V, as charging error in the admission of "evidence clearly pointing to and inferring the commission of sexual acts by some young boys at the instance of appellant". Separate discussion of each of these exceptions is unnecessary, but we shall advert briefly to some of them.

Exception 13: Permitting the prosecutrix to testify that she and the defendant and two boys went to the same rooms that she had already been to.

Exception 20: Permitting testimony as to the picking up of the two boys, Sharpe and Coleman.

Exception 22: Refusing to strike the testimony of Sharpe as to the removal of his clothing and that of the prosecutrix and the appellant. The record shows that this testimony came out during cross examination by defendant's counsel, and was, at his request, stricken as unresponsive.

Exception 24: Permitting Sharpe to testify that when he was riding around with appellant they were looking for a boy named Buck Brazzell, but did not find him, and that the witness found Coleman instead.

Exception 27: Permitting James Whitton to testify that he saw appellant and the prosecutrix in appellant's car on the evening in question, and that he had a conversation with appellant but did not go anywhere with him.

Exception 28: Permitting Bobby Taylor to be put up as a witness. This boy testified that he was with James Whitton on the evening in question, and the solicitor then asked him if he had taken the license number of a car that night. Appellant's counsel having objected, the solicitor thereupon withdrew the witness.

Exception 29: Permitting the solicitor to examine the witness, Buck Brazell, and refusing to instruct the jury to disregard his testimony. This boy testified that he had known appellant for some time. He was then asked if he knew anything about either Sharpe or the appellant looking for him "that night", to which he replied, "No, sir". The following colloquy between appellant's counsel and the presiding judge then appears in the record:

"Mr. Graydon: Judge, that's not relevant, or competent, or anything. This boy knows nothing about it. It's for no purpose whatsoever except to prejudice this defendant.

"The Court: Well, I will strike that out, and instruct the jury not to regard any of the testimony of this witness."

Exceptions 37, 38, 44, 45 and 46: Refusing to strike the evidence relating to the picking up of the two boys, Sharpe and Coleman, and to the subsequent events at the motor

court, and permitting the solicitor to cross examine appellant on these matters. The gist of these exceptions is that the testimony referred to pointed to the third count of the indictment, which had been stricken, and that it was therefore prejudicial. Examination of the record reveals that there was no testimony of any sexual act committed by either of the two boys, and that the trial judge was most careful to limit the testimony of events occurring after the offense charged in the indictment to such as was relevant under the principles expounded in *State v. Richey, supra.* Moreover, as the trial judge pointed out in ruling upon appellant's motion for a new trial, the two young boys were material witnesses as to the condition of the beds and bedclothes at the tourist court, as to appellant's confession of the crime with which he was charged, and as to the unnatural sexual act. Being thus relevant, material, and direct, this testimony was properly admitted. The rule permitting the exclusion of relevant evidence upon the ground that it would create unfair prejudice is applicable only when the evidence is merely circumstantial. 20 Am. Jur., Evidence, Sec. 253, p. 247; *Bunten v. Davis,* 82 N. H. 304, 133 A. 16, 45 A. L. R. 1409.

Ten exceptions are grouped by appellant in his brief under Questions VII and VIII, as assigning error on the part of the trial judge in submitting the count of common-law rape to the jury, and in his charge to the jury on common-law rape and on statutory rape. These assignments of error are based upon the contention that force is a necessary ingredient of the crime of common-law rape where the girl is under the age of fourteen years.

In the testimony of the prosecutrix concerning the first visit to the motor court, we find the following:

"He went in the office and got a key to No. 3, and drove me down to No. 3, and then he opened the door for me, and I told him I didn't want to go in, and he took me by my wrist and hand and made me go in. * * * He walked in and locked the door, * * * and then he told me to take off my clothes, and I told him I wouldn't, and he took them off for

me. And then he told me to go lay in the bed, and I did, and he took off his clothes. * * * and then he tried to get on top of me. He put my hands behind my head and kept trying to mash down, and I told him it was hurting, and I started crying."

While this testimony might have been sufficient to carry the issue of force to the jury, had that issue been essential, we shall disregard it, because in his charge the learned trial judge instructed them in effect that proof of force was unnecessary under the first count if the female was less than fourteen years of age and unmarried, and under the second count if she was under the age of sixteen. To quote from his charge:

"You must say, under the evidence in the case, whether or not the defendant had carnal knowledge of the female whose name is mentioned in the indictment. If he did not have carnal knowledge of her, he would not be guilty under either of the counts in this indictment. If you find that he did have carnal knowledge, why then you pass on to the elements of force and consent.

"Ordinarily it is not rape unless it is done by force, force such as to overcome resistance. The required force is that by which a dissenting female is subjected to and put under the power of an assailant, so that he is able, notwithstanding her opposition, to have sexual intercourse with her. Ordinarily, also, rape can only be accomplished where it is done without the consent of the female.

"Now, the Constitution of our State has this to say: 'No unmarried woman shall legally consent to sexual intercourse who shall not have attained the age of fourteen years'. [Art. 3, § 33.] And, therefore, I charge you gentlemen that, if you come to the conclusion from the evidence, in this case that the female, woman or woman-child, is unmarried, and if you find from the evidence that she is under the age of fourteen years, why then she cannot consent to carnal knowledge. It makes no difference whether she consented or not if you

find from the evidence that she is under the age of fourteen years and unmarried. If a child is under the Constitutional age of consent of fourteen and unmarried, it makes no difference whether she consented or not. The unlawful carnal knowledge of an unmarried child under the age of fourteen years, either with or without her consent, is rape. The facts are, of course, for you gentlemen to say: What is her age? Is she under fourteen? Is she unmarried?—and, as I have said before, the fact which must be determined by the jury: Did the defendant have carnal knowledge of her?" * * *

"Let's take up now then the second count of carnal knowledge of a child under the age of sixteen. With reference to this count, you have again the decision on the question of fact: Was there or was there not carnal knowledge. And precisely the same law, which I stated to you while discussing the first count, applies here as to what constitutes carnal knowledge. If the defendant did not have carnal knowledge of the female, he is not guilty under this count or the other. If you find that he did have carnal knowledge of her, why then the only other element you need inquire about, when you come to consider the second count, is simply whether or not she was under the age of sixteen. Under the age of sixteen years force or want of consent are not material. It is an offense even if done by the consent of the woman-child. Whether the woman-child consents or not, even if she does consent, if she is under sixteen it is unlawful for one to have carnal knowledge of such a person. The unlawful carnal knowledge, if you find it existed, which is purely a question of fact for you to determine, and the age under sixteen, are the only two elements constituting the statutory charge embraced in the second count in the indictment."

And when the jury returned for further instructions and the foreman asked the court to "clarify the difference in the two counts of the indictment", he said:

"All right, sir. Well in count No. 1, and also in count No. 2, it is necessary for the State to prove carnal knowledge. The same rule applies as to that in both cases or both counts.

Now, ordinarily, in the first count, which charges rape, in addition to carnal knowledge, the State must prove the use of force and the lack of consent of the female. However, even in the charge of rape at common law, if the female is under fourteen and unmarried, it makes no difference whether she consented or not.

"Now, in the second count, which charges carnal knowledge of a female under sixteen, why you still have the element of carnal (knowledge), but the only other element is the age limit—whether she is under sixteen years of age."

The first count of the indictment was laid under Section 16-71 of the 1952 Code of Laws, which relates to what is frequently referred to as "common-law rape", and the provisions of which are as follows:

"Whosoever shall ravish a woman, married, maid or other, when she did not consent, either before or after, or ravisheth a woman with force, although she consent after, shall be deemed guilty of rape."

By Section 16-72, rape and assault with intent to ravish are made capital offenses unless the jury shall recommend mercy, in which event the punishment for either offense is made confinement at hard labor in the State Penitentiary for not more than forty nor less than five years.

The second count of the indictment was laid under Section 16-80 of the 1952 Code, which relates to what is commonly referred to as "statutory rape", and which reads as follows:

"If any person shall unlawfully and carnally know and abuse any woman child under the age of sixteen years such unlawful and carnal knowledge shall be a felony and the offender thereof being duly convicted shall suffer as for a rape; *provided, however,* that when: (1) The woman child is over the age of ten years and the prisoner is found guilty the jury may find a special verdict recommending him to the mercy of the court, whereupon the punishment shall be reduced to imprisonment in the penitentiary for a term not exceeding fourteen years, at the discretion of the court;

"(2) The woman-child is over the age of fourteen years and under the age of sixteen years and the prisoner is found guilty the punishment shall be in the discretion of the court, not exceeding five years imprisonment; and

"(3) The defendant is under eighteen years of age and the woman-child is above the age of fourteen years previous unchastity may be defensively shown and if such want of chastity be found by a special verdict of the jury the punishment imposed by the court shall not exceed one year's impriosnment or a fine of not more than five hundred dollars, alternatively awarded."

The progenitor of Section 16-71 was the old English statute of 13 Edward I, chapter 34, enacted in the year 1285, which reads in part as follows:

"It is provided, that if a man from henceforth do ravish a woman married, maid, or other, where she did not consent, neither before nor after, he shall have judgment of life and of member. (2) And likewise where a man ravisheth a woman married, lady, damosel, or other, with force, although she consent after, he shall have such judgment as before is said, * * *."

Section 16-80, on the other hand, is derived from the English statute of 18 Elizabeth, Chapter 7, enacted in 1576, Section 4 of which reads as follows:

"And for plain declaration of law, be it enacted, that if any person shall unlawfully and carnally know and abuse any woman child under the age of 10 years, every such unlawful and carnal knowledge shall be felony, and the offender thereof being duly convicted, shall suffer as a felon without allowance of clergy."

The two English statutes just mentioned were, along with numerous others, by act of the Assembly of the Province of South Carolina ratified December 12, 1712, declared to be of force in said province. II Stat. at Large, 401, 422, 499. Presumably the crime of rape remained, as it had been at common law, a capital one, until the Act of February 4, 1869,

XIV Stat. at Large, 175, which abolished capital punishment except in case of wilful murder and made the crimes of rape and arson punishable "by hard labor in the Penitentiary for life, or for a period not less than ten years, according to the aggravation of these offences." By the Act of March 22, 1878, XVI Stat. at Large, 631, rape was made a capital offense, with provision that upon recommendation of mercy by the jury the punishment should be reduced to life imprisonment. And thus the penalty remained until the Act of March 3, 1909, XXVI Stat. at Large, 206, which prescribed the death penalty for rape or assault with intent to ravish, unless the jury should recommend mercy, in which event the punishment should be confinement at hard labor in the State penitentiary for nor more than forty nor less than five years, at the discretion of the presiding judge. In passing, we note that prior to the 1909 act the penalty for assault with intent to ravish had been imprisonment at hard labor for not exceeding thirty years, XXIV Stat. at Large, 532. It is interesting to note also that the language of Section 16-71 of the 1952 Code, defining rape, is substantially identical with that of the Statute of 13 Edward I, although the penalty has from time to time been changed by our statutes as before mentioned.

The Act of March 9, 1896, XXII Stat. at Large, 223, referred to the crime of carnal knowledge and abuse of a woman-child in language substantially identical with that of the Statute of 18 Elizabeth, except that the age of the woman-child was changed from ten years (which is said to have been the age of consent at common law) to fourteen years (which was the age of consent fixed by Article 3, Section 33, of the 1895 Constitution of South Carolina), and further provided for reduction of the penalty from that "as for a rape" to imprisonment for not exceeding fourteen years in cases where the woman-child was over the age of ten years and the jury recommended mercy. By the Act of March 7, 1921, XXXII Stat. at Large, 282, the age of the woman-child was changed from fourteen to sixteen years, and the

punishment was further graduated by provision that if the woman-child was over fourteen and under sixteen years of age it should not exceed five years' imprisonment, and also that, if the defendant was under the age of eighteen and the woman-child over the age of fourteen and the jury by special verdict found that she had previously been unchaste, the punishment should not exceed one year's imprisonment or a fine of not more than $500.00, alternatively imposed; and thus the law now stands.

Our statutes relating to rape, Code, 1952, Sections 16-71 and 16-72, and to carnal knowledge of a woman-child, Code, 1952, Section 16-80, are, of course, subservient to the provision of Article 3, Section 33 of the Constitution of 1895, which declares that "No unmarried woman shall legally consent to sexual intercourse who shall not have attained the age of fourteen years." Consent on the part of the female being fundamentally inconsistent with the concept of rape, and indeed with its very definition, it is ordinarily an essential element of the crime that the act be committed without the consent of the female, or, as it is otherwise expressed, against her will. 75 C. J. S., Rape, § 11, p. 473. And, in general, force on the part of the male and resistance on the part of the female are necessary ingredients of the crime, as indicative of nonconsent. 75 C. J. S., Rape, § 11, pp. 474, 475, 476. But the force may be actual or constructive, and the degree of force and of resistance required to characterize the act as rape must, of necessity, vary with the circumstances of the particular case. Thus sexual intercourse with a woman who is unconscious or insane is rape, and neither force nor resistance is necessary to constitute the offense. "Also, where the female is under the age of consent, force and resistance are immaterial and not necessary to constitute the offense. Hence, to constitute the offense on a female below the age of consent, the only material elements are the carnal knowledge and the age of the female." 75 C. J. S., Rape, § 13, p. 479. This conclusion is supported by the weight of authority in other

states, and is clearly to be implied from the decision of this court in *State v. Wilson,* 162 S. C. 413, 161 S. E. 104, 110, 81 A. L. R. 580, where the following from 33 Cyc. 1432, 1433, was quoted with approval:

" 'The specific intent to commit rape is an essential element both of attempt to rape and of assault with intent to rape. Therefore, to convict of either of these offenses, it must be shown that the accused intended to have intercourse with the female by force and against her will, that, in case of assault, he not only used force, but used it with the intention of having intercourse notwithstanding any resistance on the part of the female, unless she was unconscious, insane, or of such an age that she was incapable of consenting.' "

The same reasoning whereby in the case of sexual intercourse with a woman who is unconscious or insane, the elements of force and resistance are held to be immaterial, or conclusively presumed, applies where sexual intercourse is had with a female who is under the age of consent. In one case physically, in the other as a matter of law, she is incapable of consenting. Since evidence of consent, even if admissible, cannot avail as a defense against the charge of rape where the female is under the age of consent, it is manifest that in such case neither force on the part of the male nor resistance on her part is an essential ingredient of the crime. Where the female is under the age of fourteen and unmarried, the only other element necessary to be proven in order to establish the crime of rape is the fact that the defendant had sexual intercourse with her. Where she is under the age of sixteen, the only other element necessary to be proven in order to establish the crime of carnal knowledge under Section 16-80 is the fact that the defendant had intercourse with her. In neither case is it necessary for the State to prove force or want of consent, and the trial judge correctly so charged.

Appellant finally urges that the manner in which the prosecution was conducted was prejudicial and so improper as to

constitute error; and in support of this contention he points to five exceptions, to wit:

Exception 15: That the trial judge erred in allowing the solicitor to propound leading questions to the prosecutrix. Although this exception does not specify the questions on which it is based, we have considered it nevertheless; and the record reveals that in the course of the direct examination of this witness in chief appellant's counsel objected to but five questions as leading. The first two objections were as to where and how long her family had lived in West Columbia before they moved to Columbia, and were properly overruled. The third was whether the surname, by which she was known was that of her father or that of her stepfather; and the trial judge sustained the objection, although he might properly have overruled it. The fourth was to the following question: "On about the 17th of September this year, did you see the defendant anywhere? Did you see Mr. Whitener anywhere?" The objection to the question having been overruled, the witness testified that she saw him "at the store" when she was "fixing to go catch the bus", but that she couldn't remember the date, or whether or not it was in September. And finally, after the witness had testified in detail as to appellant's actions after he had made her go into the room at the tourist court, appellant's counsel objected when the solicitor asked her: "Honey, I want to know whether or not he had sexual relations with you." In view of the testimony which she had just given, the question was not leading, and the objection was properly overruled.

Exception 35: That the trial judge "erred after ruling that certain testimony of the witness Rawlinson was not proper, in failing to instruct the jury as to disregarding said testimony." We have carefully examined the transcript of the record of the testimony of this witness and fail to find that the trial judge ruled that any of it was improper.

Exception 41: That the trial judge erred in allowing the solicitor to examine the appellant concerning his relations with the sister of the prosecutrix, and to indicate by his

questions that such relationship was improper. Cross-examination of appellant as to his friendship' with the sister of the prosecutrix was of especial importance because of the fact, hereinbefore mentioned, that shortly before the trial this sister had had the prosecutrix sign a paper which appellant's counsel had marked for identification but not introduced in evidence, and which presumably was favorable to the defense; and the record of this cross-examination reveals no impropriety.

Exception 42: That the trial judge erred in permitting the solicitor to interrogate appellant as to a certain conversation between appellant and the mother of the prosecutrix. The particular conversation is not specified, but we gather that reference is to that portion of the cross-examination in which, appellant having admitted that a week before the trial he and the mother and the sister of the prosecutrix had had a conversation at Newberry, the solicitor proceeded to ask him: "Do you know anything you talked to them about yesterday a week ago? Do you know anything about this so-called letter or statement or something that Mr. Graydon produced here that they said this little girl's signature was on?" The question was not objected to, and the witness replied, also without objection: "No, sir, I have to leave those matters to my attorneys."

Exception 43: That the trial judge erred in allowing the solicitor to question the appellant "as to a certain paper which was not in evidence and which had no possible relationship or relevancy to the issues, said error being that this line of questioning was highly prejudicial to the defendant, indicating that he had secured a paper which was not disclosed by wrongful and illegal methods." The "paper" referred to is obviously the written statement of which mention has been made in our discussion of Exceptions 41 and 42. Appellant's counsel had produced it, had had it marked for identification, and had then declined to put it in evidence or to let the solicitor read it. Whether or not it was relevant to the issues was within the knowledge of appellant's counsel,

.but not of the solicitor. His examination of the appellant concerning it was entirely proper and was not such as to warrant the inference that the paper or statement had been obtained illegally or wrongfully. This exception is wholly without merit.

Because of the gravity of the offense with which appellant was charged we have considered many of the numerous exceptions in perhaps greater detail than their merit warranted. Appellant has been fairly tried, and the factual issues have been resolved against him by the jury. Careful scrutiny of the record reveals no error of law. All exceptions are overruled and the judgment of the lower court is affirmed.

STUKES, TAYLOR and OXNER, JJ., and G. BADGER BAKER, Acting Associate Justice, concur.