16778

STATE v. CORN

(77 S. E. (2d) 354)

*Messrs. Theodore & Alexander,* of Columbia, *for Appellant,*

*Mr. Robert W. Hemphill, Solicitor,* of Chester, *for Respondent,*

Sept. 10, 1953.

TAYLOR, Justice.

This appeal arises out of appellant's motion for a new trial on after discovered evidence which was refused.

The appellant, Nathan T. Corn, was first tried and convicted on December 6, 1948, of the crime of murdering George C. Beam, Jr., and sentenced to die in the electric chair. He successfully appealed to this Court and because of certain errors was granted a new trial. 215 S. C. 166, 54 S. E. (2d) 559. In November, 1949, he was again put on trial which resulted in a verdict of "guilty with recommendation to mercy" and was sentenced to imprisonment in the South Carolina State Penitentiary for life. At both trials he was represented by able and experienced counsel. In May, 1952, appellant, through counsel other than that which represented him during the trials, served notice of motion upon the Honorable Robert W. Hemphill, Esquire, Solicitor, that he would move before the Honorable Joseph R. Moss, Judge of the Sixth Judicial Circuit, for a new trial on newly or after discovered evidence. The matter was heard by Judge Moss on July 11, 1952, solely upon affidavits presented by attorneys. In the course of the hearing, defendant's counsel requested and was granted ten days additional time to file other affidavits with respondent being permitted to file counter affidavits. Both sides availed themselves fully

of the opportunity and numerous affidavits were filed. This was in line with the decision of this Court in *State v. Jones,* 89 S. C. 41, 71 S. E. 291. Subsequently, on August 20, 1952, Judge Moss filed his order refusing the motion for a new trial and it is from this order that the Defendant now appeals.

The first question for determination is whether or not at the hearing of the motion for a new trial on newly or after discovered evidence the Court erred in refusing to permit the defendant to be present in person at the hearing, in violation of the Sixth Amendment to the Constitution of the United States which provides that one charged with a crime is entitled "to be confronted with the witnesses against him" and Article 1, Section 18, of the South Carolina Constitution of 1895, which embodies a similar provision.

The notice served by appellant was to the effect that such motion would be based upon the affidavits attached thereto and such other evidence produced at the hearing. The record does not disclose that there was contemplated either by appellant or his counsel that the motion would be heard on anything other than affidavits. In appellant's affidavit he asked only to be present in person but did not ask to be heard, on the other hand, he purported to know nothing about the alleged confession. Appellant's affidavit submitted with the original motion made no request to be present and there was no contention that there was any new or other evidence that appellant could submit if he were present; and at no time was any request made by appellant to be heard in person on the motion, the statement being: "your deponent is informed and believes that he is entitled to be present in person at such hearing on July 11, 1952, and that your deponent, as the accused, and moving party, has a right under the Constitution of the United States and the Constitution of the State of South Carolina of 1895 to be present at such hearing." What transpired at this hearing could under no circumstances be termed a trial or part of a trial. No indictment was proffered and no testimony taken

by examination or cross-examination, no jury selected, charged or sworn, and of course, by no stretch of the imagination could the proceeding be termed a portion of the trial at which he was sentenced, *State v. Haines,* 36 S. C. 504, 15 S. E. 555; *State v. Atkinson,* 40 S. C. 363, 18 S. E. 1021; *State v. Farne,* 190 S. C. 75, 1 S. E. (2d) 912.

The following statement from *State v. Suber,* 89 S. C. 100, 71 S. E. 466, 468, affords some light on this subject:

"Mr. Greenleaf in his admirable work on the Law of Evidence in volume 1, page 1620, subd. 4, observed: 'Does the hearsay rule—*i. e.,* as involving the right of cross-examination, and incidentally of confrontation, of witnesses— require that in criminal cases (where the constitution secures the right, and therefore overrides any statutes regulating views), the defendant should be present at a view? The requirement of confrontation implies merely, that the party shall have the opportunity of cross-examining witnesses, and a view by the jury is not the consultation of witnesses, but merely the inspection of the thing itself, which is the subject of the controversy; so that the constitutional principle cannot properly apply to render improper a view at which the accused is not present. This is the result reached by the better judicial opinion; but there are courts which take the contrary view.'

"The principles we deduce from the authorities are (1) that in a constitutional sense, the viewing of the premises by the jury is not the taking of testimony; (2) that the prisoner is not thereby deprived of the right to confront or cross-examine any witness in the case; and (3) that it cannot reasonably be supposed that the prisoner's rights would in any respect be prejudiced by the absence of the judge, if the jury merely inspected the locality. Of course, if the orders of the presiding judge are disobeyed to the prejudice of the defendant, the court would take such steps as would be deemed necessary to protect his rights."

The foregoing is supported by *State v. Faires,* 125 S. C. 281, 118 S. E. 620, 621, wherein this Court said:

"Neither is defendant's personal presence at the hearing of such motions essential within the meaning of the common-law rule, which affords to a defendant charged with a felony the right to be personally present at his trial. * * * As the trial, in the sense contemplated, must have necessarily, been terminated when a motion for new trial or in arrest of judgment is made * * *, so the trial of the issues joined between the defendant and the state—which is the trial sought to be changed as to venue or continued by these motions—has not commenced and is necessarily still pending when the motions are made. * * *

"He was deprived by his absence of no right, either technical or substantial, * * *."

Analogous is the case of *Snyder v. Massachusetts,* 291 U. S. 97, 54 S. Ct. 330, 335, 78 L. Ed. 674, 90 A. L. R. 575, in denying the accused's demand that he be present at the viewing of the scene by the jury:

"A fertile source of perversion in constitutional theory is the tyranny of labels. Out of the vague precepts of the Fourteenth Amendment a court frames a rule which is general in form, though it has been wrought under the pressure of particular situations. Forthwith another situation is placed under the rule because it is fitted to the words, though related faintly, if at all, to the reasons that brought the rule into existence. A defendant in a criminal case must be present at a trial when evidence is offered, for the opportunity must be his to advise with his counsel. *Powell v. Alabama,* [287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527], supra, and cross examine his accusers, *Dowdell v. United States* [221 U. S. 325, 31 S. Ct. 590, 55 L. 5d. 753], *supra; Com. v. Slavski* [245 Mass. 405, 140 N. E. 465, 29 A. L. R. 281], supra. Cf. *Felts v. Murphy,* 201 U. S. 123, 26 S. Ct. 366, 50 L. Ed. 689. Let the words 'evidence' and 'trial' be extended but a little, and the privilege will apply to stages of the cause at which the function of counsel is mechanical or formal and at which a scene and not a witness is to deliver up its message."

Applying the foregoing principles to the question at bar, it would seem that (1) this was not a trial and no part of a trial; (2) there is no affidavit of the defendant or request of defendant to be heard in person; (3) that the affidavit of defendant himself stated that he knew nothing of the claimed confession about which this motion revolved; (4) there was neither notice of, nor effort to, cross-examine any witness, no notice of request for, or effort to examine. or cross-examine any of the persons whose affidavits were submitted pursuant to the original notice of motion. It, therefore, is the conclusion of this Court that the presence of defendant was neither necessary nor material and that the fact that he was not present deprived him of no substantial or constitutional right.

In an appeal from an order denying a motion for a new trial, it is settled by numerous cases that this Court may not nicely weigh the testimony upon which such a motion is based; that power rests in the Circuit Court, for it has at hand the instrumentalities with which to exercise the power, and that Court's settled judgment ought not to be impeached except for errors of law, or for an abuse of its discretion. *State v. Griffin*, 100 S. C. 331, 84 S. E. 876. The hearing Judge, being bound by the foregoing principle of law, was required to look into the nature of the motion and the character of the evidence to support it. This motion originally revolved around a typewritten statement on each page of which appeared the signature of W. J. Corn, the deceased father of the appellant, Nathan T. Corn.

The uncontradicted facts appeared to be that on May 20, 1952, one of appellant's present attorneys not the one who represented him at the other two trials, his mother, Mary Corn, one Harry E. Crump and J. L. Lingerfelt, appeared at the office of the Honorable Robert Hemphill, Solicitor, and presented him with an envelope on which was written in longhand, "give this to a good lawyer and have him check

everything good—the inclosed statement is the true facts in this case—wrote and signed by me W. J. Corn."

Inside of this envelope was another envelope, designated No. 2, on which were the signatures of W. J. Corn, Rev. Harry Erskine Crump, J. L. Lingerfelt and C. A. Bush and enclosed in this envelope was the following two page type-written statement which, at the request of Mrs. Corn, the Solicitor opened and read and then passed to appellant's attorney:

"I have a owful burdon i have carred every sence the death of George Beam. I could not tell no one not even my good wife, but I am soon to go out to meet a Just God, I cant meet him with this on my heart, I cant die with out making this confession, its always been a mystry who killed George Beam. well I am the Man. on satarday night of June (5—1948 George Beam:

come into my place, that was my filling station on the charlet hieway and was so drunk he could harly walk he demanded of me to let him have some money i said george you owe me so much i just cant let you have any more untell you pay me that you owe me. he then cursed me with an-Oth and said if you dont let me have it i will kill you and take it all out of the cash drower and what you have two, I told him to get out of my place he turneb and started out and as he went out he said I'll get you old man; he went out and got in a car that was waiting on him in frunt of my place some man was driving the car as he drove off i seen it had a North Carolina tag on the car thay went back toward Rock Hill i was so mad I grabed this German Luger Pistol the oficers took from my home I got in the red pick up truck and took off after them i followed them to the Bulk Plant I parked out side the gate untell I seen george get out of the car and went in at the ofice door this car drove off I drove the truck on in side and up to the plat-form of the Bulk-plant. I went in at the sliding door george was coming from thefrunt ofice I said here's the old man and i am redy to have it out and as he started by me i grabed him

by the colar and said you are going to pay me now. we are going to settle up once and for all. he said i dont owe you any thing and i wont pay you any thing that made me so darn mad knowing he owed me as much as he did i had got up the coldest nights ever come and let him in and he would just want to get a little money. then he turned toward the sliding door he cursed me againfor a sunof a-bitch and i said George if you dont pay me now you will never live to pay no one. that is when (I W. J. Corn) shot george beam in the back and

"/s/ W. J. Corn

W. J. Corn

"Killed him with this German Luger Piston I crated the body in the bulkplant i hurred fast as possible i was afraid his friend in the N.C. car would come back after George i loded the crate on the red truck by rolling it over untell i could get it in the truck i then cleaned up all the blood all off the floor with some old waste and rags as i new it would haft to be cleaned up at once or it might not come up, so i got it all cleaned up i throad the waste and every i had used in the truck i then took off at all the red truck would make to Crowders Creak. i drove across the bridge and turned around and drove back up on the bridge and as close as possible to the edge of that railing on the bridge i stopped i rolled the crate over one time and it hit the edge of the truck. then i rolled it one more time and it lay on the railing of the bridge. i droped it in the water and i got away from there soon as i could i went back to my filling station on the charlett hie-way but did not open up any more that night but i drove the truck around to the. back of my house and cleaned the truck and burnt all of that waste and rags i had used to clean up the blood with so as that if my wife did go to put any thing in the trash can she would not find-them. on sunday morning of June (6- 1948 i went back to the bulk-plant to see if i had left

one stain for i did not want any Innonce person Involved in this criam.

Nathan T. Corn my son is Innocent of this crime I am sarry for all the truble i have coused; But God has delivered my soul and i will soon go out to meet my maker;

"/s/ W. J. Corn

W. J. Corn

"I am the man that shot and killed George Beam on June (5—1948 with the German luger pistol No S.H.2025—410. "I Swear that the above statement was wrote by me and the facts contained there in are true in this case.

"/s/ W. J. Corn

W. J. Corn

"This was Rot.12,1951"

According to the affidavits of Mary Corn, Harry Crump, J. L. Lingerfelt, and one Bush none of them had ever seen the typewritten statement. Crump, Lingerleft and Bush (whose names appeared on envelope No. 2) said they had signed the envelope approximately three weeks before W. J. Corn died at the request of Mary Corn and that there was nothing in the envelope at the time. Crump and Lingerfelt stated that when they signed their names on the envelope they were of the opinion that W. J. Corn was making provisions for the care of Mrs. Corn after his death as he stated that "he had the papers in order and Mrs. Corn would be taken care of."

Subsequent to the handing of these two envelopes to the Solicitor, the matter was taken up with Deputy Sheriff Allison and Lt. Fred Wolfe who proceeded to contact S. C. Penitentiary officials, Capt. Ashemore and Officers Dawkins and Thompson. Appellant's cell was searched and the following letter in an envelope postmarked May 25, 1952, Rock Hill, S. C. was found:

"226 Columbia Ave
Rock Hill, S. C.
May 25—1952

"Mr. Nathan T. Corn
1515 Gist Street
Columbia, South Carolina

"Dear son, this lonly sabith after noon i will try to write you a few lines in answer to your i received friday glad to hear from you and that you was well. I injoyed the visit with you yesterday but yet—it was sad of course we had to talk about loosing poor dady. but son he is at rest and is out of his suffering but Oh how lonly and sad am I in this old dard world senly alone. son Juney and his wife stayed with me last night and thay have just left and gone home and i am alone, gess sis will be over some time this after noon. Nathan i intended to come down this morning but i was not able to make the trip and harrison promised me he would go and as usel grace was gone down in the contry to her mother's and harrison and boby was alone and thay sleep untell it was two late to make the trip down there. but nathan i have talked to him and i dont think you have any thing to werry about. he had kinly got settled sence he went back to work last week. so he is all right i just come plain and told him what i new and all i new. so he was kinly got recknised. and Nathan i went to see Mr Kale yesterday and i told him what you said and he told me he was going over to see you yestarday eving and would have a long talk with you/

but i never got to see any of the papers you ask me to see he said they had not been sent to him yet but he was looking for then in the mail yestarday he ask me if i ever stayed up and keep the filling station open at night when you and Dady was away i told him No that you or dady would never let me stay open at night with out one of you was there. Oh he ask me a few qusetion but i could gladly answer every one, so i was told that i would get a copy of every thing the first of the week. so i hope i do i just cant understand.

well son i have just been out to the Cemetery and looked at dady's grave. i am sarry son i did not bring the pictures in with me yestarday for you to see. I had then madee for you. i have two of dady in the castet and one with the castet closed and of the flowers and son he just looks as if he was redy to speak to me i would not take any thing for then. i just thought that it would be the only way you would ever have of knowing how your Dady was put away. but son when you see it you will know i put him away nice people have spoke of how nice i put him away. but that was the last thing i could do for him. it cost me && 760.21 but i dont mind it i only had five hundred inshurence on him but i will get it all payed. I am going back to work to marrow Monday night if any one wants to call me thay will haft to call me after four in the after noon, or at seven thirty in the morning befrew i go to bed. well son gess i will stop as i must write Roy a few lines, so keep your head up and if you ever did try to prayer do son Prayer for your mother, so answer soon and Lots of love from Mother God bless you son,

"fron Mary Corn"

At the first hearing in York on July 11, and subsequently during the time allotted for additional affidavits there was no affidavit denying the authenticity of this letter. It further appears that there was no denial that the statement was signed by W. J. Corn or that the letter was written by Mary Corn to Nathan Corn at the State Penitentiary. During the hearing, the Court's attention was invited to numerous similarities and peculiarities contained in the statement and the letter when compared. These similarities appear as follows:

1. The use of small "i" in both documents.

2. The lack of use of capital letters when spelling days of the week in both.

3. The comparison yestarday in the letter and Satarday in the statement showing the use of "a" in the second syllable of each.

4. The spelling of the word "until" as "untell" in the letter from Mrs. Corn and written untell in the statement.

5. The spelling of the word "sorry" as "sarry" in the letter of Mrs. Corn and the spelling of the same word as "sarry" in the statement.

6. The use of the word "two" for "too" in the letter and in the statement.

7. The use of the word "new" for "knew" in the Mary Corn letter and in the statement.

8. In the statement between lines 5 and 6 there is typed in "June (5—1948 George Beam," indicating the statement was copied from a prepared proof.

9. The lack of punctuation between sentences in both the letter and the statement.

10. The fact that most sentences in both letter and statement begin with "i".

11. The use of the dash (—) in the date on the letter and the inserted date on the statement.

12. The use of the spelling "sence" in the letter and in the statement for the word "since".

13. The use of the spelling "redy" for ready in both letter and statement.

14. The use of the spelling "thay" for they in both letter and statement.

15. The way anything is spelled "any thing" with spaced words, instead of one word, in both letter and statement.

16. The use of the expression "haft" for have to in both letter and statement.

17. The use of the word "dont"—without apostrophe as punctuation for don't in the letter and statement.

18. The use of capital I for the number "1" (one) in both the letter and the statement.

The foregoing is evident from a comparison of the statement and the letter heretofore referred to but also introduced into the record were some "slips" in the handwriting of W. J. Corn that show that he spelled George "gorg" and pickup "pickaup" and "pickop" while in the statement or

alleged confession George and pickup are both spelled correctly.

Considering all of the foregoing along with the actions of Mary Corn in the face of her statement that she knew nothing of the contents of the envelope and the fact that W. J. Corn sat beside his son and heard him sentenced to be executed and later at the second trial heard him sentenced to life imprisonment for something which it is now contended he himself did together with the fact that he died approximately three weeks after he purportedly wrote this confession from the effects of a malignancy, one is faced with a set of circumstances that must be viewed with the greatest suspicion, *State v. Mathis,* 174 S. C. 344, 177 S. E. 318. The normal reaction of a parent is to shield the child where possible and it is not unreasonable to suspect this as being the motive behind the alleged confession here. W. J. Corn and his wife both knew he was dying and beyond the reach of the law. The Circuit Judge found as a fact that this statement or purported confession was the handiwork of Mary Corn and there is certainly an abundance of evidence to this effect.

The hearing Judge is the determiner of the facts in such matters and unless his findings are influenced or controlled by error of law or unless his conclusions are so illogical and unreasonable as to amount to an abuse of discretion his findings are binding upon this Court, and we are of the opinion that there is ample evidence to sustain his findings and there is no abuse of discretion or error of law here that would warrant this Court in setting aside the order appealed from.

Judge Moss in his order went into the matter of whether or not the W. J. Corn statement would be admissible at another trial should one be ordered and his findings are excepted to and made a part of this appeal; however, in our view it is not necessary to pass upon this question for the purpose of determining this appeal.

We are of the opinion that all exceptions should be dismissed, the order appealed from affirmed and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES and OXNER, JJ., concur.