17557

STATE, Respondent, v. Frank MAYFIELD, Appellant
(109 S. E. (2d) 716)

*Frank Mayfield,* of Columbia, *in pro personam,*

*Messrs. Daniel R. McLeod, Attorney General,* and *James S. Verner, Assistant Attorney General,* of Columbia, *for Respondent,*

14

July 20, 1959.

Legge, Justice.

In November, 1950, in the Court of General Sessions for Greenville County, appellant was convicted of housebreaking and larceny and sentenced by the Honorable J. Frank Eatmon, Presiding Judge, to imprisonment for eleven years. On October 22, 1957, he filed a motion for new trial on after-discovered evidence; and at the May, 1958, term, pursuant to an order of that court, he was brought from the South Carolina State Penitentiary to Greenville, where he appeared in his own behalf and was heard on his motion before the Honorable J. Robert Martin, Jr., then presiding. By his order dated August 28, 1958, Judge Martin refused the motion. Appeal is from that order.

Since the case at bar is somewhat interlaced, procedurally, with two others, reference to them is necessary.

1. In March, 1949, in the Court of General Sessions for Greenville County, the appellant Mayfield was convicted of highway robbery and larceny and sentenced by the Honorable Joseph R. Moss, Presiding Judge, to imprisonment for twelve years. We shall later refer to this as the *Moss case*.

2. In March, 1950, in the same Court, he was sentenced by Judge Lewis to three years' imprisonment for housebreaking and larceny. We shall call this the *Lewis case*.

3. The case at bar, involving the sentence by Judge Eatmon (eleven years) in November, 1958, we shall call the *Eatmon case*.

Mayfield did not appeal in the *Moss case,* or in the *Lewis case.* He did appeal in the *Eatmon case;* but the appeal was not perfected and was dismissed by the Honorable Steve C. Griffith, Presiding Judge, by order dated November 10, 1954.

In April, 1958, Mayfield petitioned for a writ of habeas corpus in the *Moss case* and in the *Lewis case*. He had previously, as before stated, filed a motion in the *Eatmon case* for new trial on after-discovered evidence. The petitions and motion were argued before Judge Martin at the May, 1958, term; and by separate orders dated August 28, 1958, Judge Martin disposed of them as follows:

1. The petition in the *Moss case* was based upon two contentions, viz.: (a) that the case, which resulted in a general verdict of "guilty," had been submitted to the jury on two counts when under the facts but one single, continuing criminal act had been committed; and (b) that the trial judge had exceeded his authority in imposing a sentence of twelve years. In his order denying it, Judge Martin held: that although the printed form of the indictment bore the title "Indictment for Highway Robbery and Larceny," only one count was set out in the body of the indictment, to wit: a count charging highway robbery; that even if the indictment were viewed as setting forth two counts, the petitioner, who had been represented at the trial by able counsel of his own choice, should have moved to quash one count, or to require election between the two counts, prior to the verdict (Code 1952, Section 17-409), which was not done; that under any view the general verdict of guilty must be interpreted as a finding of guilt on at least the primary offense charged, that of highway robbery; and that the trial judge had not exceeded his authority in imposing a sentence of twelve years, because the indictment had charged the petitioner with robbery while armed with a pistol, a crime punishable (Code 1952, Section 16-333) "by imprisonment at hard labor for a term not exceeding twenty-five years, in the discretion of the presiding judge."

2. The petition in the *Lewis case* sought adjudication to the effect that the sentence in the *Eatmon case* should run concurrently with that in the *Lewis case*. It appeared that the sentence of three years in the *Lewis case* had been imposed while the petitioner was serving his sentence of twelve years

in the *Moss case*; and the Lewis sentence had recited that it was to "run consecutively to any other sentence heretofore imposed." It also appeared that the eleven-year sentence in the *Eatmon case* has recited that it was "to run consecutive to the sentence the defendant is now serving." The petitioner, admitting that the twelve-year sentence and the three-year sentence ran consecutively, contended that the eleven-year sentence should run consecutively to the twelve-year sentence, but not consecutively to the three-year sentence or to the twelve-year and the three-year sentences combined, because the above-quoted language in the eleven-year sentence must be taken as referring to the twelve-year sentence, which was the only one that the petitioner was then serving. Judge Martin agreed with this contention, and ordered that the eleven-year sentence should run concurrently with the three-year sentence, and that both should together run consecutively to the twelve-year sentence imposed by Judge Moss. The effect of this order was to make the three sentences aggregate twenty-three years.

3. The motion for new trial in the *Eatmon case* was denied. That motion, and the order denying it, will be discussed later. Notice of appeal from that order was timely given.

In November, 1958, Mayfield filed with the Clerk of this Court a petition for a writ of *certiorari* in the *Moss case*. In that petition he suggested that there was a "diminution of the records" and he prayed that we issue the writ, commanding that the Court of General Sessions for Greenville County certify and transmit to this court certain papers claimed by the petitioner to be of record in the said lower court, and which the petitioner described as follows: (1) Copy of the trial proceedings in the *Moss case*; (2) Application for writ of *habeas corpus*; (3) Order denying petition for the said writ; (4) Indictment; (5) Notice of Appeal; (6) Bill of Exception; (7) Record on Appeal; (8) Affidavit in support of application for leave to appeal *in forma pauperis*; (9) Order granting leave to appeal *in forma pauperis*; (10) Let-

ter to court correcting an error in the writ of *haebas corpus*; (11) Solicitor's receipt for "all papers heretofore filed in this matter"; (12) Sentence; and (13) Statement of the case.

Incorporated in the petition for *certiorari* just mentioned was a "Bill of Exception and/or Grounds for Appeal," the substance of which we condense as follows: (1) That the case was submitted to the jury on two counts, whereas the facts showed the commission of but one single continuing criminal act; (2) That therefore the trial court should be required to determine how much of the sentence had been imposed for highway robbery and how much for larceny and to vacate the illegal portion of the sentence; and (3) That since the evidence showed that no weapon had been used in the commission of the crime, the trial judge was without power to impose a sentence of more than ten years.

This petition for *certiorari* was denied by our formal order of December 8, 1958. On March 12, 1959, Mayfield prepared, and thereafter filed with the Clerk of this Court, a request or "motion" that this Court determine whether the denial of his petition for *certiorari* in the *Moss case* had been based upon "adequate independent State grounds or on Federal Constitutional grounds," and whether he (to whom he refers as "the appellant herein") "has exhausted his State Court remedies in the above entitled cause." Although the appeal now before us is in the *Eatmon case*, not the *Moss case*, and although, so far as we are informed, no proceeding for review of our order of December 8, 1958, is pending, we shall nevertheless state here the reasons that impelled our denial of *certiorari* in the case last mentioned. They were as follows:

1. Mayfield's remedy, with respect to his conviction and sentence by Judge Moss, was by appeal. He did give notice of such appeal, but the appeal was not perfected and was dismissed by Judge Griffith on November 10, 1954, as before stated. No appeal from Judge Griffith's order was taken.

2. The grounds upon which the petitioner sought the writ (*i. e.,* the "Bill of Exception and/or Grounds for Appeal" before mentioned) were in substance the same upon which he had sought *habeas corpus* in the lower court in April, 1958. They had been considered by Judge Martin and disposed of adversely to petitioner's contentions by his order of August 28, 1958, to which we have referred. No appeal was taken from that order.

3. Certification of the trial proceedings was not timely sought where requested for the first time eight years and eight months after the trial.

In November, 1958, Mayfield filed with the Clerk of this Court a petition for *certiorari* in the *Eatmon case*. In that petition he suggested that there was a "diminution of the record", and he prayed that we issue the writ commanding that the Court of General Sessions for Greenville County certify and transmit to this court: (1) a copy of the trial proceedings; (2) the indictment; (3) a copy of the order of the Court of General Sessions directing the clerk to furnish petitioner with copy of the trial transcript; (4) motion for new trial, and order thereon; (5) notice of appeal; (6) affidavits of Earl Fleming, George Ray Hassie and R. M. Bullock in support of motion for new trial; (7) minutes of two hearings before the South Carolina Probation, Parole and Pardon Board concerning Earl Fleming in 1950; (8) copies of all indictments in Greenville County against Ray Hassie in 1950; (9) copy of "V. L. Ashmore's threats against petitioner's life"; (10) bill of exceptions; (11) statement of the case; and (12) application for leave to proceed *in forma pauperis* and order thereon.

Incorporated in this petition for *certiorari* is a "Bill of Exception and/or Ground for Appeal", the substance of which we condense as follows: (1) that petitioner's conviction was based upon perjured testimony; (2) that the prosecution "fixed" convict witnesses and gave them their freedom in order to get them to swear falsely against him; (3) that one of the witnesses for the prosecution (Lieutenant V. L.

Ashmore, of South Carolina Law Enforcement Division) had threatened petitioner's life, and that therefore petitioner was not at liberty to testify freely at his trial; (4) that under the circumstances petitioner cannot obtain a fair and impartial trial in Greenville County; and (5) that the sentence was excessive and therefore illegal.

This petition for *certiorari* also contained petitioner's "Concise Statement of Nature of Case", which recites petitioner's conviction at the November, 1950, term, of housebreaking and larceny, and his sentence, by Judge Eatmon, to eleven years' imprisonment. It states that "the jury was drawn, but never sworn as required by law". It states further that immediately upon being sentenced petitioner gave notice of intention to appeal to the Supreme Court of South Carolina, stated in open court that he was without funds with which to pay for the transcript of the trial, and requested that he be furnished a copy thereof without cost, whereupon Judge Eatmon instructed the court reporter to prepare and furnish the petitioner with a copy of said transcript, without cost. It states further that "nearly two years passed before the petitioner was furnished with the transcript of said trial and in the meantime, upon motion of the Solicitor, petitioner's appeal was dismissed because of not being perfected". (We note, in passing, that Judge Griffith's order dismissing the appeal was not issued until November 10, 1954, more than four years after the trial, and more than two years after Mayfield's receipt of the transcript.) It states further that petitioner's motion for new trial was dismissed by Judge Martin's order of August 28, 1958, from which appeal is taken.

As before noted, this petition for *certiorari* showed that the trial record had already been obtained by Mayfield several years before; it referred to the order refusing his motion for new trial as being under appeal; and it set forth a "Bill of Exception and/or Ground for Appeal" obviously referable to that motion and to Judge Martin's order refusing it. In the circumstances, the petitioner acting in his own behalf

and not having requested appointment of counsel, we considered his petition as indicating his intention to perfect his pending appeal; and accordingly we took no action upon it. In January, 1959, Mayfield filed an affidavit for leave to proceed *in forma pauperis,* which we granted. That affidavit sets out, as "grounds for this appeal", the same grounds that had been incorporated in the petition for *certiorari* as a "Bill of Exceptions and/or Ground for Appeal" to which we have already referred; and, in addition, "that appellant was tried and found guilty by an unsworn jury and by reason thereof was deprived of a jury trial and the same was a violation of appellant's statutory as well as his constitutional rights guaranteed by both the State and the Federal Constitutions." To that affidavit were attached copies of the following:

1. A portion of the testimony of State's witness W. K. Greer, on direct examination.

2. Judge Eatmon's order of April 30, 1952, directing the court reporter to furnish the defendant with a transcript of the record of the case, without cost;

3. Affidavit of Earl Fleming, dated November 1, 1954;

4. Affidavit of George Ray Hassie, dated —— 1957;

5. Affidavit of R. M. Bullock, dated November 3, 1952;

6. Newspaper article appearing in the Anderson Independent on December 17, 1950; and

7. Newspaper article appearing in the Greenville News on November 4, 1950.

In a subsequent "Statement of the Case", dated April 30, 1959, the following grounds of appeal are stated:

1. That after several witnesses had been called, Judge Eatmon appointed an attorney to represent the appellant, but refused to allow this attorney to cross examine the witnesses who had testified prior to his appointment;

2. That the key witnesses for the prosecution were habitual criminals to whom, for their testimony, rewards had been promised before the trial and given thereafter;

3. That the jury was not sworn;

4. That appellant was never arraigned or advised prior to his trial as to the nature of the charges against him; and

5. That Judge Eatmon charged the jury the law applicable to the defense of alibi, although appellant had not testified and had not offered witnesses as to that defense.

The last mentioned "Statement of the Case" was agreed to by the Attorney General for the purpose of the appeal, except so much thereof as stated that the jury had not been sworn and that appellant had not been arraigned or notified of the charges against him, and as referred to the rewarding of witnesses.

Appellant has filed two briefs, one entitled "Appellant's Brief", the other "Appellant's Argument". In both he states that this appeal is from Judge Martin's order of August 28, 1958, denying appellant's motion for new trial on after-discovered evidence. In both he asks that we consider the entire record, and not limit our consideration to the issues raised by that motion and Judge Martin's ruling thereon. The Attorney General has filed a brief for the State.

The issues which appellant seeks to raise here concerning his arraignment, the swearing of the petit jury, the trial judge's refusal to permit cross examination of certain witnesses, the charge as to alibi, and the excessiveness of the sentence were not raised before Judge Martin and were not passed upon by him. The trial record, which we have examined, does not reveal that they were raised at the trial. They are not properly before us, *State v. Alexander,* 230 S. C. 195, 95 S. E. (2d) 160; but we may, and shall, as a matter of grace, consider them, *State v. Orr,* 225 S. C. 369, 82 S. E. (2d) 523.

The trial record before us consists of a transcript of the proceedings at the trial commencing with the testimony of the first witness for the State, on October 30, 1950, and ending with the recess on the afternoon of November 3, 1950, following the court's refusal of the motion for acquittal made by defendant's counsel at the close of all of the

testimony. It does not contain a transcript of proceedings prior to the swearing of the first witness, nor does it contain a transcript of the judge's charge. It contains, therefore, nothing concerning arraignment or the swearing of the jury.

In his order of April 30, 1952, Judge Eatmon recites that the defendant Mayfield had represented himself in the trial of his case in the fall of 1950; that he had cross examined witnesses and otherwise presented his own defense; that immediately upon being sentenced he had given notice of his intention to appeal and, stating that he was without funds with which to pay for a transcript of the trial, had requested that he be furnished with a copy thereof for the purpose of perfecting the appeal; and that thereupon the official court reporter had been instructed to promptly prepare and furnish the defendant with a copy of such transcript. This order further recites that although nearly eighteen months had passed since the trial it had come to the court's attention that the defendant had not yet been furnished with such copy; and it proceeds to order the court reporter to prepare, with all convenient speed and dispatch "a copy of the transcript of the record of the case above entitled and furnish the same to said defendant without cost or expense to him." That the appellant was furnished with the transcript shortly thereafter is admitted by him in his "Concise Statement of Nature of Case" before referred to, wherein he states that "nearly two years" passed after his trial before he was furnished with the transcript of said trial. That transcript he has filed in his present appeal. As before stated, it does not purport to cover proceedings at the trial prior to the testimony or subsequent to the trial judge's ruling on the motion for acquittal. If appellant had required a transcript of them for the purpose of his appeal he should have promptly called attention to their omission. Instead, he has, after a lapse of some eight years, attempted for the first time to raise issues concerning his arraignment, the swearing of the jury, and the trial judge's charge.

We find no merit in his contention that he was not arraigned. It has no support other than his statement to that effect. Against it is the presumption of regularity in the trial proceedings, and his own statement that he had pleaded not guilty. The Attorney General has presented, with his brief, an affidavit, dated May 1, 1959, of the lady who had been the official court reporter during appellant's trial in 1950. In it she avers that she has been unable to locate her original notes of the beginning of the trial, but that she distinctly remembers that the defendant was arraigned, there having been at the time of his arraignment a discussion between him and the presiding judge as to whether or not he desired an attorney. She also avers that the jury was sworn in the usual manner and the defendant was again asked if he desired to have counsel appointed to represent him. Also filed with the Attorney General's brief are affidavits of three of the jurors, all to the effect that the clerk of court had read the indictment to the defendant; that he had replied that he would plead not guilty; and that the jury was sworn in his presence.

But to reject appellant's contentions we need not consider the affidavits before referred to. If in fact he was not arraigned, he waived arraignment by his voluntary entry of the plea and by going to trial without objection. 14 Am. Jur., Criminal Law, Sections 255, 256, p. 942; *State v. Brock,* 61 S. C. 141, 39 S. E. 359. Absence of affirmative statement in the transcript that the jury was sworn furnishes no factual support for appellant's contention that it was not. *State v. Hollman,* 232 S. C. 489, 102 S. E. (2d) 873. Appellant's statement that the jury was not sworn stands alone, and is, in our opinion, insufficient to overcome the contrary presumption. But if indeed the jury was not sworn, that was a fact known to appellant during the trial and which he should then and there have called to the attention of the trial judge. His contention, made for the first time more than eight years afterwards, comes too late. One may not take his chance of a favorable verdict and, after an

unfavorable one, raise an objection that should have been made before the verdict was rendered. 31 Am. Jur., Jury, Sections 243, 244, pp. 206, 207; *State v. Ballew,* 83 S. C. 82, 63 S. E. 688, 64 S. E. 1019, 18 Ann. Cas. 569; *State v. Knotts,* 129 S. C. 357, 123 S. E. 828; *Brown v. Singletary,* 226 S. C. 482, 85 S. E. (2d) 738; *State v. Harreld,* 228 S. C. 311, 89 S. E. (2d) 879; *State v. Rayfield,* 232 S. C. 230, 101 S. E. (2d) 505.

Also without merit is appellant's contention that his ▪ counsel was not permitted to cross examine the witnesses who had testified prior to his appointment. On the second day of the trial, after the fifth witness for the State had testified, appellant, who had theretofore declined the court's offer to appoint counsel for him, requested the trial judge to appoint Mr. John Bolt Culbertson, an able and experienced member of the Greenville bar, as his counsel. Thereupon Mr. Culbertson was sent for and, having conferred briefly with appellant, stated that he would accept the court's appointment, requesting however that he be given a reasonable time in which to talk with the court reporter, the witnesses, and the defendant, and to review the testimony already taken. For this purpose a recess from 12:45 p. m. that day until 10:00 a. m. the next was ordered. Thereafter Mr. Culbertson conducted the defense. The record shows no request on his part or on that of appellant that any of the witnesses who had theretofore testified be recalled for further cross examination.

Appellant's contention that the trial judge should not ▇▇▇ have charged the law applicable to alibi cannot be sustained. Prior to the date of the alleged offense, appellant, who had been in the State penitentiary serving his sentence in the *Moss case,* had been transferred from the penitentiary to the Greenville County Central Convict Camp. The State offered evidence tending to prove that on the night of August 19-20, 1950, appellant and his brother-in-law, George Ray Hassie, broke into the place of business of Texize Chemical Corporation and there committed grand

larceny. Appellant did not testify, nor did he offer any witnesses; but the cross examination of the State's witnesses, both by appellant himself and later by his court-appointed counsel, was directed in great part toward proving that at the time of the commission of the crime he was within the enclosure of the Central Convict Camp. Alibi is not an affirmative defense imposing upon the accused the burden of its proof. It does not require testimony of the accused or of witnesses produced by him. It may be established as well by the testimony of witnesses for the prosecution. If the nature of the crime is such that the presence of the accused at the place and time of its commission is essential to his guilt, the burden is upon the State to prove beyond a reasonable doubt that he was then and there present. Where the evidence, taken as a whole, whether adduced by the prosecution or by the accused, is sufficient to raise in the minds of the jury a reasonable doubt as to his presence at the scene of the crime, he is entitled to acquittal. 23 C. J. S., Criminal Law, § 923, p. 200; *State v. McGhee,* 137 S. C. 256, 135 S. E. 59; *State v. Floyd,* 174 S. C. 288, 177 S. E. 375; *State v. Bealin,* 201 S. C. 490, 23 S. E. (2d) 746. Cross examination of the State's witnesses having raised the issue of alibi, the trial judge did not err in charging the law applicable thereto.

Housebreaking is punishable by imprisonment for a term not exceeding five years. Code 1952, Section 16-332, Grand Larceny, a felony, *State v. Huffstetler,* 213 S. C. 319, 49 S. E. (2d) 585, is punishable by imprisonment for a period of not less than three months nor more than ten years. Code 1952, Section 17-552. Appellant was convicted on both these counts. The sentence of eleven years was within the statutory limits. It is not contended that either statute violates the constitutional injunction, Article I, Section 19, against cruel and unusual punishment. It is not suggested that the sentence was the result of partiality, prejudice, oppression or corrupt motive. In such circumstances we may not disturb it because of alleged excessive-

ness. *State v. Conally,* 227 S. C. 507, 88 S. E. (2d) 591; *State v. Alexander,* 230 S. C. 195, 95 S. E. (2d) 160.

Before discussing the motion for new trial and Judge Martin's order refusing it, we shall review briefly some of the evidence adduced by the State at appellant's trial.

Appellant and George Ray Hassie, his wife's brother, were jointly charged with having broken into a building of Texize Chemical Corporation on the night of August 19-20, 1950, and stolen therefrom property of the value of more than $100.00. Hassie pleaded guilty, testified for the State, and was sentenced by Judge Eatmon to four years' imprisonment with the provision that upon service of one year the remainder of the sentence would be suspended, subject to probation for three years.

Mr. W. K. Greer, of Texize, testified that the plant was closed and the gates locked on Saturday afternoon, the 19th; and that the door to the main office was closed, but not locked. The robbery was discovered on the following Monday morning. In the main office, file cases and desk drawers had been broken open, the office safe had been turned over and smashed open, and about $25.00 in cash that had been left in it was missing. On the floor were a pick, a crowbar, and an axe. An electric drill, valued at $100.00, that had been in the shop behind the office, was missing. The door to another office had been broken open; the desk in that office had been mutilated and broken into; scattered on the floor were several pieces of paper; one of them, on which was a shoe-print, was picked up by Mr. Paul H. Hughes, identification and fingerprint officer of the office of the county sheriff.

Officer V. L. Ashmore, of the State Law Enforcement Division, called into the investigation by the sheriff, arrested Hassie and took a statement from him. Hassie led Ashmore and Deputy Sheriff Wood to a spot on a railroad spur, where they found a tin box containing some drill bits. Before arresting Hassie, Ashmore had carried Mayfield from the Con-

vict Camp and placed him in the county jail. Ashmore brought from the Camp a pair of tennis shoes, which Mayfield freely identified as his. On cross examination Ashmore was asked whether he had promised Hassie probation if he would plead guilty; to which the witness replied that he had not.

Frank Fowler, a mechanic employed at the Convict Camp, identified the tin box, referred to in Ashmore's testimony, as having been at the camp, and the bits in it as being of the same type as those that had been in it at the camp. He testified that the box of bits was missing from the camp about the time of Mayfield's arrest.

Deputy Sheriff Wood testified that on August 23, following a telephone call, he started looking for Hassie, Mayfield and Mayfield's wife; that he could not find Hassie, but that Hassie was located and arrested on August 26. On August 24, the witness, in company with other officers, found two sets of footprints leading from the outside to the plant fence and from there toward the main office. One set appeared to have been made by tennis shoes. Attempt to make a plaster cast was unsuccessful. The witness was present with Ashmore when Mayfield identified as his the tennis shoes that had been found at the Convict Camp.

Deputy Sheriff Bill Jones testified that in company with other officers he arrested Hassie on August 26 at his father's home; that he was present when Hassie made his statement that night, in the sheriff's office; that the statement was voluntarily made, and that Hassie was promised nothing. The witness typed Hassie's statement, which Hassie then signed; and the witness was among the officers who accompanied Hassie to the spur track, on the Worley Road, where the metal box containing drill bits was found.

Identification Officer Hughes testified that he sent to the Federal Bureau of Investigation, in Washington, D. C., the piece of paper with the shoe-print on it that had been found on the floor of the Texize office, and the tennis shoes before mentioned.

Frederick E. Webb, Special Agent of the Federal Bureau of Investigation in Washington, identified the shoeprint as having been made by the right shoe of the pair of tennis shoes.

George Ray Hassie testified as follows: Some weeks prior to August 19, 1950, Mayfield, who was driving a truck in the vicinity of Poe Mill, asked Hassie to come out to the Central Chain Gang Camp to see him. Hassie did so that evening, and they engaged in general conversation for about an hour. The following Saturday, Hassie went to the camp again; and this time Mayfield told him that had something "lined up to pick up some easy money." Hassie demurred, but went to see Mayfield a few days later, about 7:00 o'clock in the evening; and then Hassie agreed to go with Mayfield, and to pick him up on the following Saturday night. Between 10:00 and 11:00 o'clock that Saturday evening, Hassie drove to the main gate of the camp, but Mayfield told him that he could not get out that night. The following Wednesday or Thursday night they met again and decided on Saturday night, the 19th. On the night of Saturday, the 19th, Hassie picked Mayfield up on the Worley Road, behind the prison camp. Mayfield had a sledge hammer; and he told Hassie that he had placed some drill bits by a telephone pole in case they should need them. Hassie had brought along some whiskey, and he and Mayfield first went up on Piney Mountain and drank it. Then they drove to a brick factory, parked the car, walked through a swamp to the back fence of the Texize plant, and climbed over it. Hassie testified to the breaking and entry, the smashing of the office safe, and other details of the robbery. He testified that both he and Mayfield wore gloves; that he wore overalls and loafers; that Mayfield wore overall pants, a T-shirt, and tennis shoes. He testified that after the robbery he drove Mayfield to the convict camp and let him out there between 5:45 and 6:00 a. m., they having on their way there thrown away their tools, and the electric drill that they had taken from the Texize plant, at a garbage dump

on the Piney Mountain Road; and that he then went to the home of his parents, where he was living, and went to bed. He testified to his arrest, his voluntary statement to the officers, and his leading them to the place where Mayfield had told him the drill bits had been placed. He testified that he had signed his plea of guilty, and that the solicitor had promised him nothing, telling him to wait and be sentenced at the end of the case. He testified that on the Saturday before the trial, at the request of his sister, Mayfield's wife, he had gone to the county jail, where Mayfield was; and that he had then told Mayfield and his wife that he, Hassie, was not going back on the statement he had given to the officers.

Fleet Craigo, night guard at the convict camp, testified that shortly before dark on the evening of August 19, Mayfield requested permission to go to the gate and talk with his wife; and that Craigo gave him permission to do so; that Mayfield was not in at 9:00 p. m., when the prisoners were counted; that Craigo had Earl Fleming, who was a cook and trusty, look for him; and that when Craigo went off duty at 5:45 a. m. Sunday, the 20th, Mayfield had not yet come in. On cross examination he admitted that the search for Mayfield had not been thorough, and that he could not say that Mayfield was not inside the camp fence on the night of the 19th and early morning of the 20th. He also testified that when he let Mayfield go to the gate on the night of the 19th, Mayfield was wearing his prison stripes.

R. M. Bullock, another guard, testified that he went off duty at 6:00 p. m. on August 19, when Craigo went on; that about 9:00 p. m. he and Grover Brown, another guard, made a search for Mayfield and found him with his wife in one of the shacks at the gate, where apparently prisoners were permitted to meet their wives. Bullock didn't bring Mayfield back because Craigo had given him permission to go there. The next time Bullock saw Mayfield, the latter was drinking coffee in the kitchen at 6:00 a. m. on the 20th. At that time Mayfield had on stripes and was wearing the

same slippers that he had been wearing at 9:00 p. m. the night before.

Earl Fleming, a trusty and cook at the convict camp, whose bed was next to that of Mayfield in the stockade, testified that Mayfield was not in his bed at 9:00 p. m. on August 19; that the last time that he saw Mayfield that evening was at about 8:45, when Mayfield was sitting out in front of the stockade with two or three others; that about 3:30 a. m. on the 20th, Fleming got up, "figuring on fixing breakfast", and Craigo then told him that Mayfield had not come in; that at Craigo's request he went to look for Mayfield, but he could not find him, although he looked in several buildings including three shacks near the fence; and that when he next saw him, Mayfield was standing in the door of the kitchen at 5:50 a. m., drinking coffee. On cross examination he stated that Mayfield was wearing striped trousers when he saw him on the night of the 19th; that on August 23, Mr. Bramlett, the son of the camp superintendent, took Fleming to the county jail; that there he saw George Ray Hassie, but did not talk to him; that Fleming asked Mr. Wood, the deputy sheriff, to speak to Wood's brother-in-law, the parole officer, about helping him to get a parole; that Wood came to see him at the county jail, and they talked about Fleming's application for parole, but never mentioned Mayfield or Hassie. When asked by appellant's counsel whether he had mentioned to Wood that he "could tell him who had been doing this robbing", he replied: "No, sir, I did not." He testified that his application for parole was denied.

In support of his motion for a new trial on after-discovered evidence, appellant offered the following documents:

Exhibit 1: His own affidavit to the effect that at the time of the alleged crime he was confined at the convict camp and could not have committed said crime; that he so advised his counsel, Mr. Culbertson; and that upon the advice of his said counsel he offered no testimony at the trial.

Exhibit 2: Affidavit of R. M. Bullock dated November 3, 1952, stating that the affiant had been a guard at the convict camp on August 19, 1950, and knew of his own knowledge that appellant was at the camp between 9:00 p. m. and midnight of that date, and was also there at 6:00 a. m. the following morning.

Exhibit 3: Copy of an article by one Brim Rykard in the December 17, 1950 issue of the Anderson Independent, a newspaper published in Anderson, South Carolina. This article concerned a recent hearing before the State Probation, Parole and Pardon Board, at which certain officers of Greenville County had appeared on behalf of Earl Fleming's application for parole, upon the ground that Fleming had been of assistance to them in breaking up a series of robberies in Greenville County. The article implied that the Mayfield case was one of those that Fleming helped to solve.

Exhibit 4: Affidavit of Earl Fleming dated November 1, 1954, stating that he had been a prisoner at the convict camp on August 19, 1950; that during that night he saw Mayfield at the camp at approximately 9:00 p. m., 10:00 p. m., 11:30 p. m., 2:00 a. m., and 6:00 a. m.; that affiant had testified falsely against appellant, because Deputy Sheriff Wood and State Law Enforcement Officer Ashmore had promised him a parole if he would help to convict Mayfield; that these officers told him that unless he cooperated with them they would take away his good conduct time on the 10-year sentence that he was serving, and would charge him with larceny of some groceries that had been stolen from the prison camp; and that they told him what he should testify to at Mayfield's trial.

Exhibit 5: Copy of minutes of the hearing on December 14, 1950, on the application of Earl Fleming for parole, before the South Carolina Probation, Parole and Pardon Board. This document is not in the record before us; but it is referred to in Judge Martin's order of August 28, 1958, as follows: "These minutes do not show the details of any statements made by parties appearing before the Board but

do show that Pralo Wood, Chief Deputy Sheriff of Greenville County, and Lt. V. L. Ashmore, State Constable, appeared before the Board and 'pled for Fleming's parole on the grounds of his helping solve several bank robberies in Greenville without whose help the solving would have been impossible.' "

Exhibit 6: The indictment in which George Ray Hassie was charged, along with Mayfield, with the crime of housebreaking and larceny with which we are now concerned, showing plea of guilty by Hassie on November 13, 1950,[1] and his sentence on that date by Judge Eatmon as before mentioned. Also from other Greenville County indictments against Hassie, all placed on the contingent docket on the date just mentioned, as follows:

Roll No. B654—Housebreaking and larceny
Roll No. B655—Housebreaking and larceny
Roll No. B656—Malicious mischief
Roll No. B657—Criminal conspiracy

Exhibit 7: Copy of an article in the Greenville News-Piedmont of November 4, 1950, concerning Mayfield's trial that had ended with the jury's verdict of guilty at 5:10 p. m. on November 3. This article mentions that sentence had not been imposed, and that a motion for new trial would be argued on November 13. It states also that Hassie had pleaded guilty and had testified for the State, and that he had not yet been sentenced. It concludes as follows: "Culbertson told the Court that a few minutes before he had seen Lt. V. L. (Bill) Ashmore of the South Carolina Law Enforcement Division (constabulary). Mr. Culbertson stated the officer had some very caustic remarks to make about how I had given Frank Mayfield the idea of smearing his friends and it was a very good idea for Frank to be in the custody of the Court because he would like to strangle him himself."

---

[1] This indictment is not in the record before us; but it is apparent from the record here that Mayfield was convicted on November 3, and that sentencing was deferred until November 13, at which time both he and Hassie were sentenced.

Exhibit 8: Affidavit of George Ray Hassie dated ———, 1957, in which Hassie repudiates his testimony at the trial and states that he had not seen Mayfield on the night of August 19, 1950, and that he had never broken into any place with Mayfield. In this affidavit Hassie states that he had testified falsely because Deputy Wood and Officer Ashmore had threatened to press some old charges against him if he refused, and had promised that if he would cooperate he would not serve more than a year and the old charges would be dropped.

A motion for new trial on after-discovered evidence ██ ██ is addressed to the sound discretion of the trial court. *State v. Clamp,* 225 S. C. 89, 80 S. E. (2d) 918. And the movant must show that the evidence upon which it is based: (1) is such as would probably change the result if a new trial is had; (2) has been discovered since the trial; (3) could not by the exercise of due diligence have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching. *State v. Strickland,* 201 S. C. 170, 22 S. E. (2d) 417; *State v. Clamp, supra; State v. Wright,* 228 S. C. 432, 90 S. E. (2d) 492.

Exhibit 1 relates to matters obviously known to ap-██ pellant before and during the trial. Bullock's affidavit (Exhibit 2) is at most impeaching, and not much stronger than his testimony to which we have referred, in which he was unable or unwilling to say that Mayfield had not been in camp on the night of the crime. Besides, it does not appear that the evidence contained in his affidavit could not have been discovered before the trial. Exhibit 3, the article in the Anderson Independent of December 17, 1950, and Exhibit 5, the minutes of the Parole Board hearing on December 14, 1950, were not material to the issue of Mayfield's guilt or innocence. The most that can be said for them is that they tended to possible impeachment of the testimony of officers Wood and Ashmore. So also with Exhibit 6.

The statement attributed to Ashmore in Exhibit 7 seems also quite immaterial. It furnishes no basis even for the con-

tention, irrelevant to this appeal, that appellant "was not at liberty to freely testify in and during his trial proceeding", especially in the light of appellant's statement (Exhibit 1) that his decision not to take the stand was made on advice of his counsel, and in the light also of the fact that the alleged statement appears to have been made after the case had been submitted to the jury. No mention of it appears in the trial record before us, nor is it suggested that appellant's counsel made any reference to it in his motion for new trial on November 13, 1950.

We come, then, to consideration of Fleming's affidavit (Exhibit 4) and that of Hassie (Exhibit 8), wherein these important witnesses repudiated the testimony that they had given at the trial. Judge Martin suggested in his order that these affidavits, if believed, would have warranted the granting of a new trial; but he concluded that they were not worthy of belief. He pointed out that Fleming, an habitual criminal, was confined in the State penitentiary along with appellant when he made his affidavit (November 1, 1954) and was so confined, serving a long sentence, when the order of August 28, 1958 was issued. We note, additionally, that this affiant, who was serving a ten-year term when he testified at appellant's trial, and who appears (Exhibits 3, 5) to have been paroled in December, 1950, was convicted on September 7, 1951, of a highway robbery committed on April 21, 1951, and was sentenced for that crime to imprisonment for ten years; and that that conviction was affirmed on appeal. *State v. Fleming,* 228 S. C. 129, 89 S. E. (2d) 104. Judge Martin pointed out, too, that Hassie, also a confirmed criminal, was appellant's brother-in-law, and at the time of making his affidavit was confined in the Greenville County jail along with appellant.

The credibility of newly-discovered evidence offered in support of a motion for new trial is a matter for determination by the circuit judge to whom it is offered. In him, not this court, resides the power to weigh such evidence; and his judgment thereabout will not be disturbed except for

error of law or abuse of discretion. *State v. Corn,* 224 S. C. 74, 77 S. E. (2d) 354.

"Recantation of testimony ordinarily is unreliable and should be subjected to the closest scrutiny when offered as ground for a new trial." *State v. Whitener,* 228 S. C. 244, 89 S. E. (2d) 701.

To hold such affidavits sufficient to require the granting of a new trial would be to open the door to fraud and perjury, as well as to invite interminable delays in the disposition of causes. *State v. Workman,* 38 S. C. 550, 16 S. E. 770. Their character, and that of the affiants, furnished reasonable basis for Judge Martin's rejection of them. Certainly we cannot say that his judgment in the matter was based on error of law, or that it constituted abuse of judicial discretion.

The statements of Fleming and Hassie in their respective affidavits to the effect that they had testified falsely because of threats and promises made by Officers Ashmore and Wood do not, in our opinion, bring the instant case within the scope of the holdings in *Napue v. People of State of Illinois,* 79 S. Ct. 1173, 1176 and *State v. Bethune,* 104 S. C. 353, 89 S. E. 153.

In the *Napue case,* one Hamer, the principal witness for the State, had testified in response to a question by the Assistant State's Attorney that he had received no promise of consideration in return for his testimony. The Assistant State's Attorney had in fact, as he later admitted, promised the witness Hamer that if he would testify against Napue he would recommend a reduction of Hamer's sentence. Hamer's testimony that he had received no promise of consideration was therefore false and known by the Assistant State's Attorney to be so; but the latter did nothing to correct it or to inform the jury of its falsity. The lower court rejected Napue's post-conviction petition, and the Supreme Court of Illinois affirmed, holding that the petitioner was not entitled to relief because the jury had already been apprised that someone, whom Hamer had tentatively identified as being a public defender, "was going to do what

he could" for him. On appeal to the Supreme Court of the United States the question presented was "whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment." And that court, following *Mooney v. Holohan,* 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791, and *White v. Ragen,* 324 U. S. 760, 65 S. Ct. 978, 89 L. Ed. 1348, held that the conviction, obtained through use of false evidence known to be such by the prosecuting attorney, did not meet the requirement of due process, and declared further that the constitutional infirmity was not removed by the fact that Hamer had testified that an unidentified lawyer from the public defender's office had offered to help him.

In *State v. Bethune,* 104 S. C. 353, 89 S. E. 153, 154, we held that a new trial should have been granted because of the affidavit of the assistant solicitor to the effect that he had talked with the State's chief witness before the trial; that the statement then made by the witness was essentially different from his testimony on examination by the solicitor at the trial; and that affiant had not disclosed this information to the solicitor during the trial. To quote from the opinion:

"The theory of the law is that the duties of solicitor are *quasi* judicial, and that, while it is more especially made his duty to conduct the prosecution so as to present the facts upon which the state seeks a conviction, nevertheless the duty rests upon him to see that no act on his part shall prevent the prisoner from having a fair and impartial trial. The state does not desire a conviction in any case unless the prisoner has been accorded those rights that entitle him to a fair trial. When the assistant solicitor heard the witness McFadden testified differently, from the statements which he had already made, it was his duty to bring such facts to the attention of the solicitor in order that he might take such steps as might be necessary to enable the prisoner to have a fair trial."

The case at bar turns on circumstances wholly different from those involved in either *Napue v. People of State of Illinois* or *State v. Bethune*. In Napue, the vice of the conviction lay in the prosecuting attorney's knowledge of the perjury and his failure to disclose it to the jury; in Bethune, in the assistant solicitor's knowledge of, and failure to disclose to the solicitor, the conflict between the witness' testimony and his previous statement. In each of those cases the court was concerned not with the credibility of witnesses, but with the effect, as a matter of law, of the admitted conduct of the State's attorney. In the case at bar, there is no suggestion that the solicitor knew of any threats or promises having been made to Fleming or Hassie, if in fact any were made. It is not suggested that he knew or had any reason to believe that the testimony given by them at the trial was false, if indeed it was false. The persons whose testimony is here offered in support of the motion for new trial because of newly discovered perjury are those who now profess to be perjurers. The primary issue on the motion was their credibility.

Affirmed.

STUKES, C. J., and TAYLOR and OXNER, JJ., concur.

Moss, J., did not participate.

